CHARLES LAMONT ROBINS, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 20064

September 19, 1990                    798 P.2d 558

---

[Rehearing denied December 18, 1990]

*Morgan D. Harris,* Public Defender, and *Stephen J. Dahl,* Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland* and *Bradford R. Jerbic,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant, Charles Lamont Robins (Robins), raises numerous issues on appeal that he contends warrant a reversal of his convictions for first degree murder and felony child abuse with substantial bodily harm. Robins also contests the validity of his death sentence. Our review of the record persuades us that Robins was fairly tried and sentenced. We therefore affirm.

## The Facts

The evidence adduced at trial demonstrated a pattern of abusive treatment of eleven-month-old Brittany Smith (Brittany) by Robins, who was living with the child and her mother, Lovell McDowell. This abusive treatment by Robins ultimately resulted in the infant's untimely and brutally violent death.

Several witnesses testified concerning Robins' abusive treatment of Brittany. Evidence indicated that Robins regularly punched and kicked Brittany. He often held his hand over her mouth and nose until she gasped for breath. On several occasions Robins held Brittany underwater in the bathtub until she came up gasping for breath. One witness observed an occasion when Robins caused the infant to turn blue from lack of breath. Robins frequently shut Brittany in a dark bathroom for several hours at a time. Once he was seen holding the infant over a second floor railing by her neck and shaking her. Other incidents of abuse by Robins included putting Brittany on the top shelf of a closet (some six feet above the floor), closing the door, and letting her fall to the floor. Robins would also force his finger down Brittany's throat and cause her to gag. One witness testified that Robins frequently repeated this abuse until the child could no longer gag and ceased crying.

At one point Brittany suffered a broken leg, for which medical treatment was delayed. The child's fracture was evidenced by a painful knot on her leg. Initially, neither Robins nor the mother sought treatment for the infant; however, after the knot reappeared and became quite painful, Brittany was taken to the hospital. Radiographs revealed that Brittany's right femur was fractured and that callus had formed, which meant the fracture was from ten to fourteen days old. Moreover, an examination of the radiographs also showed the presence of a previous partially healed fracture that occurred ten to twenty days earlier. Brittany's condition required her placement in a body cast. A witness recounted seeing Robins swing Brittany by the cross-bar of her cast (the body cast extended from Brittany's waist down her legs, with a cross-bar between the legs).

Over a period of time, several reports were received by the Las Vegas Metropolitan Police Department's (LVMPD) child abuse unit concerning Brittany. However, follow-up investigations failed to uncover the extent of the abuse in the home and no remedial action was ever taken. Brittany's mother, Lovell McDowell, was interviewed concerning the child's broken leg. McDowell falsely explained at the time that the injury was caused by babysitters, whose whereabouts in California were unknown.

The events leading to Brittany's death occurred in the early morning hours of April 19, 1988. The details of that morning were supplied by several witnesses.

McDowell testified that on the night Brittany died, the child was sleeping and she and Robins finished eating around 12:30 a.m. Thereafter, she fell asleep but was soon awakened by sounds of gagging or choking. She hollered to Robins, "What's wrong with Brittany?" He responded, "nothing wrong." The mother arose and encountered Robins, who was holding Brittany, in the hallway. She then returned to the room to get Brittany a towel when she heard Robins hollering, "Brittany, come on. Brittany, wake up. Wake up Brittany." McDowell immediately dialed 911 and thereafter ran into the parking lot of their apartment complex, screaming that her baby had stopped breathing. An Air Force Sergeant heard the screams and sought to help the child by performing CPR. The security guard called the LVMPD and paramedics were also immediately summoned.

The paramedics rushed Brittany to the hospital where measures were taken to restore breathing and a heartbeat. The infant could not be revived, however, and was pronounced dead shortly after her arrival.

A LVMPD officer responding to a call met Robins outside the apartment at approximately 2:30 a.m. Robins was given a *Miranda* warning, following which he gave the officer a brief statement recounting the events of the evening. Later a homicide detective with the LVMPD was dispatched to Robins' apartment in reference to an infant's death. A taped statement was taken from Robins and following an investigation, Robins was arrested for Brittany's murder.

A medical examiner's autopsy investigation revealed a number of injuries, some of which were substantially more recent than others. The external exam revealed bruises under Brittany's jaw, bruises on the upper portion of her sternum and a number of bruises on her back. Additionally, there was a small hemorrhage in the left flank. The internal examination uncovered a number of injuries. First, there were multiple hemorrhages in the scalp on the left side and top of the head and there were bilateral subdural hemorrhages. The brain was swollen (a direct response to injury). Further internal examination of the abdominal and thoracic cavities revealed additional injuries. There were a number of hemorrhages in the mesentery (supporting connective tissue) of the intestines. Additionally, there was substantial internal scarring on the left side below the kidney. The scar tissue encased the ureter, and extended from the kidney down to the large intestine.

Dr. Hollander's microscopic examination of the scar tissue revealed numerous injuries. There were fresh hemorrhages, granulation tissue (the body's first reaction to injury in the healing process), and fibrous (scar) tissue which takes approximately six weeks from the initial injury to form. The medical examiner noted that Brittany's right femur showed signs of having been broken in the past. She had to reference Brittany's medical records to ascertain that the leg had been broken twice and was in the process of healing.

Finally, the autopsy revealed that Brittany had suffered a transverse separation of her eleventh thoracic vertebra (a broken back). It was the examiner's opinion that this injury was the result of substantial blunt force trauma that was administered less than twenty-four hours prior to Brittany's death.

In conclusion, the medical examiner opined that CPR, even if improperly performed, could not have caused Brittany's injuries. She was of the opinion that Brittany was a battered child and that death was by homicide.

Robins testified on his own behalf. He admitted doing many of the things testified to by the State's witnesses. However, he characterized his actions as rough play, to make Brittany tough. Incredibly, Robins stated that he had no intention of hurting Brittany.

Robins specifically denied ever picking Brittany up by the cross-bar of her body cast. He also denied putting his finger down Brittany's throat to gag her. He did admit to putting his fingers in Brittany's mouth in an effort to prevent her from spitting. Robins testified that he never hit Brittany in the face with his fists with or without jewelry on his hands and denied the existence of the bathtub incidents.

Robins admitted placing Brittany in the bathroom when she cried and company was present. His stated reason for doing so was to persuade her to stop crying. Robins also denied that he had ever picked the child up by her neck as charged by the State's witness. He said that he had picked her up by the arms. Again, he denied any intention of hurting the baby in any of these actions.

Robins also placed a benign connotation on Brittany's experience on the closet shelf. He stated that in an effort to teach Brittany not to crawl off the bed, he put her on the bottom shelf of the closet and allowed her to fall off that shelf. The shelf, according to Robins, was three and one-half inches above the floor. He denied ever placing Brittany on a closet shelf six feet above the floor.

Concerning the events on the night Brittany died, Robins testified in detail. He stated that he and McDowell had been

engaged in a "romantic encounter," after which they fell asleep. Robins said he woke up and that following a telephone call, he and McDowell ordered pizza. Robins also stated that McDowell did not go to sleep after eating pizza, as she had testified. Robins said he told McDowell he was going to wake Brittany in order to check on her because she had been congested with a cold and had occasionally vomited.

After Brittany was awake, Robins said he played with her for a few minutes. McDowell called out, telling Robins not to be too long with Brittany. Eventually, Robins kissed Brittany and got up to leave when he heard Brittany cough twice and saw her start to spit up. He said Brittany was breathing rapidly and that he froze, waiting for her to snap out of it. According to Robins, Brittany just stopped breathing. Robins testified that at that point he panicked. He said he yelled, "Brittany, wake up. Brittany, wake up." In an effort to awaken her, Robins threw water in her face but she was still unresponsive. At that point he laid her back down and tried to apply CPR.

Robins spoke freely with the police and stated that he told them to the best of his knowledge what had occurred. Robins said he loved Brittany like a daughter, and while admitting to rough play, he denied any intention to hurt or kill Brittany. He admitted to being the last person to see Brittany conscious.

Five days following the return of guilty verdicts by the jury, the penalty hearing commenced. The State called several witnesses who described Robins as an extremely violent man. In particular, Robins had severely beaten a young man who was involved in Robins' drug sales. Robins had made numerous statements to friends and associates that he would kill a police officer. Finally, there was evidence that Robins had threatened to bomb the apartment where McDowell, Brittany and another of McDowell's boyfriends were living. His stated purpose was to kill everyone in the apartment. The police were called and the situation was peacefully resolved.

McDowell concluded her testimony during the penalty phase by relating, over defense counsel's objection, that her brother and uncle had received threatening notes while she was in jail. Robins was also in jail when the notes were delivered.

Additionally, there was evidence indicating Robins was substantially involved in the sale of rock cocaine. Evidence of one of Robins' arrests for the sale of cocaine was introduced. Robins objected to this testimony because charges were never filed. There was also some testimony tending to connect Robins with gangs.

In his defense, Robins called several witnesses. Generally, the tenor of the testimony concerned not seeing Robins abuse either

Brittany or other children he had been around, his general nature and non-violent personality.

### Discussion

Robins raises nine issues on appeal. Initially, Robins argues that the trial court erred in failing to grant a requested motion for mistrial. The basis for Robins' contention is testimony from Officer Sandra Durgin during cross-examination referencing a possibility of Robins being involved with drugs.[1]

Prior to trial, an uncontested motion in limine was granted restricting the prosecution from bringing into evidence any of Robins' alleged drug involvement. The State had specifically agreed to instruct its witnesses against mentioning anything pertaining to Robins' drug involvement during their testimony.

Robins' contention lacks merit, and error, if any, is harmless. This court has held in similar cases that where there is "overwhelming evidence of guilt," such an error is harmless. Pasgove v. State, 98 Nev. 434, 436, 651 P.2d 100, 101-2 (1982); Hendee v. State, 92 Nev. 669, 670, 557 P.2d 275, 276 (1976). The evidence produced by the State against Robins in the instant case was indeed overwhelming. Additionally, we have held:

> In respect of the guilt phase of appellant's trial, the applicable standard of review requires appellant to prove that the inadvertent statement was so prejudicial as to be unsusceptible to neutralizing by an admonition to the jury.

Allen v. State, 99 Nev. 485, 490, 665 P.2d 238, 241 (1983). Moreover, despite ruling that defense counsel's question opened the door to Officer Durgin's candid response, the trial court ordered the testimony stricken and admonished the jury to disregard what it had heard. Robins has failed to show that Officer Durgin's statement was prejudicial beyond neutralization by the

---

[1]On cross-examination by defense counsel, the following exchange took place:

Q  You went out on the 2nd of February to the Gold Dust Apartment; is that correct?
A  Yes.
Q  I believe that you had a conversation with the manager of the apartments and another person; is that correct?
A  Yes, sir.
Q  And what was the purpose of engaging in those conversations?
A  I had information that the gentlemen living with Lovell McDowell was carrying the moniker of Crazy, that he was possibly a drug dealer.

court's admonition to the jury. The trial court did not err in refusing Robins' request for a mistrial.

Robins argues that he was unfairly prejudiced by the joinder of the child abuse charge and the first degree murder charge. This issue also lacks merit. It is the established rule in Nevada that joinder decisions are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. Lovell v. State, 92 Nev. 128, 132, 546 P.2d 1301, 1303 (1976).

Additionally, we recently held in Mitchell v. State, 105 Nev. 735, 782 P.2d 1340, that "if . . . evidence of one charge would be cross-admissible in evidence at a separate trial on another charge, then both charges may be tried together and need not be severed." *Id.* at 738, 782 P.2d at 1342. In the instant case, it appears that most, if not all, of the evidence relating to the child abuse charge would have been cross-admissible on the murder charge.

A careful review of the record shows that Robins consistently tormented and abused the eleven-month-old victim. Robins began living with the child and her mother in January 1988, and only three and one-half months later, Brittany's short life ended. The evidence presented by the State showed a pattern of unrelenting violence by Robins against the helpless infant. There was no single incident of abuse that appears to stand out as the sole basis for a conviction of the child abuse charge; and it appears from the record that a number of abusive actions preceded the accelerated acts of violence leading to Brittany's demise. Robins' history in progressively increasing the torture and abuse inflicted on his tiny victim was essential to a complete understanding of both crimes for which he was convicted.

Finally, the standard of review for alleged error concerning joinder of claims falls under the harmless error analysis. *Mitchell,* 782 P.2d at 1342-43. Therefore, error arising from misjoinder will be reversed *only* if the error has a "substantial and injurious effect or influence in determining the jury's verdict." *Mitchell,* 782 P.2d at 1343 (quoting United States v. Lane, 474 U.S. 438, 450 (1985)).

Under a harmless error analysis, the jury's verdict suffered neither substantial nor injurious effects or influence as a result of the joinder. Moreover, we perceive no abuse of discretion by the trial court in joining the charges; the evidence was cross-admissible, and in any event, Robins has failed to demonstrate prejudice requisite for reversal based upon improper joinder.

Robins also contends that he was unfairly prejudiced by objectionable expert testimony. We disagree. Dr. Frumkin, who treated Brittany in the hospital emergency room the night of her death, was qualified as an expert in emergency medicine. However, over defense counsel's objection, Dr. Frumkin was permitted to view autopsy photographs and testify concerning the injuries depicted. During the course of his testimony, Dr. Frumkin stated that he did not feel qualified as a forensic pathologist to specify with any certainty the age of the bruises depicted on certain photographs. Concerning the autopsy photograph depicting Brittany's severed spine, Dr. Frumkin stated that he had never seen an injury like that in a living person, but in his opinion, it would "involve considerable force, more than would be performed certainly within the course of cardiopulmonary resuscitation." Dr. Frumkin further opined that the force would involve "a rather severe bending type of force with some angulation of the spine."

Next, Dr. Hollander expressed her expert opinion that Brittany was a "battered child." Robins objected to this testimony because Dr. Hollander's expertise stemmed only from studies of injured children and children who had been killed, and the experience acquired from publishing two papers on the subject. Robins complained that Dr. Hollander's experience was insufficient to qualify her to render such an opinion.

We have held that the threshold test for the admissibility of expert testimony is:

> [W]hether the expert's specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. The goal, of course, is to provide the trier of fact a resource for ascertaining truth in relevant areas outside the ken of ordinary laity. Moreover, expert testimony must also withstand the challenge to all relevant evidence, i.e., whether probative value exceeds prejudicial effect. NRS 48.035(1).

Townsend v. State, 103 Nev. 113, 117-18, 734 P.2d 705, 708 (1987). Additionally, any error in determining admissibility is evaluated under the harmless error standard. *Id.* at 118, 734 P.2d at 708.

Although Dr. Frumkin was not qualified as an expert in forensic pathology, he could, from his experience as a medical doctor, describe the injuries depicted in the photographs and express an opinion concerning the force required to inflict such injuries. Moreover, Dr. Frumkin's opinion concerning the force necessary

to sever the child's spine was supported by Dr. Hollander, a qualified expert, who stated with certainty that Brittany's broken back was the result of "substantial" blunt force trauma. Robins suffered no prejudice from the testimony he viewed as objectionable by Dr. Frumkin.

Finally, there was no error in admitting Dr. Hollander's opinion that Brittany was a battered child. Under the standard announced in *Townsend,* the admissibility of Dr. Hollander's testimony characterizing Brittany as a battered child was within the discretion of the trial court. Dr. Hollander stated she had studied children who had been injured and killed and had published two papers on the subject. The district court, after weighing these credentials and evaluating Dr. Hollander's ability to assist the trier of fact in understanding the evidence and determining issues of fact, allowed the testimony.

Moreover, even without the testimony from Dr. Hollander that Robins finds objectionable, it appears compellingly certain that the jury would have reached the same conclusion. Demonstrably, Brittany had suffered a fractured spine and a twice broken right femur for which medical attention had been delayed for approximately three weeks. She sustained numerous internal injuries over a period of time in addition to external injuries reflected by the presence of a number of bruises. Percipient witnesses also testified of the brutal physical abuse inflicted on eleven-month-old Brittany by Robins. The trial court did not err in admitting the expert testimony of Dr. Hollander and Dr. Frumkin, and even if error had occurred in admitting the testimony, it would have been harmless beyond a reasonable doubt.

Next, Robins contends that he was unfairly prejudiced by the entry into evidence of autopsy photographs.[2]

---

[2]Robins objects to Exhibits 2, 6, 9, 10 and 11.

Exhibit 2 was described by the forensic pathologist, Dr. Hollander, as a "photograph of the back of Brittany Smith with three incisions which were made there . . . [showing] the hemorrhages under the skin. It also shows an incision over the mongolian spot showing that there is no hemorrhage there."

Exhibit 6 was described as a photograph

[O]f the left side of the head of Brittany Smith. After the scalp was pulled over off the bone and shows the hemorrhages that are present, it shows multiple small hemorrhages under the scalp itself and three major areas of hemorrhage in the top, front and back of the head.

Dr. Hollander described Exhibit 9 as

[T]he surface of the brain. You can also see in this photograph a flattening of the surface of the brain, that is the convolutions which

Robins' challenge to the autopsy photographs is based solely on a footnote from *Sipsas v. State*, 102 Nev. 119, 716 P.2d 231 (1986), which stated in pertinent part:

> No jury could be free from thoughts of compassion and sympathy after viewing an $8'' \times 10''$ color photograph of an eviscerated child. A photograph lends dimension to otherwise non-dimensional testimonial evidence. That an erroneous admission of a photograph would cause undue prejudice is certain. The extent of that prejudice is immeasureable.

*Id.* at 124, n.6, 716 P.2d at 234.

Robins' reliance on *Sipsas* is misplaced. There, the State's witness testified that the objectionable photograph "might" aid his explanation of the autopsy findings, and the trial judge specifically made a factual finding that the photograph was too prejudicial. The photograph was later improperly admitted during the defense's case. This court determined that the lower court in *Sipsas* abused its discretion by admitting the photograph which had previously been excluded as prejudicial.

On appeal, we review allegations of error concerning the admissibility of autopsy photographs under an abuse of discretion standard. *Ybarra v. State*, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984). Absent an abuse of discretion by the trial court, the decision will not be overturned on appeal. *Turpen v. State*, 94 Nev. 576, 577, 583 P.2d 1083, 1084 (1978).

In the instant case, following an objection by counsel, the trial court reviewed the photographs and held:

> [I]t appears to the court that based on the nature of the testimony the pictures are not unduly repetitious and I think

---

make up the surface of the brain appear as if it were stuffed into a plastic bag and flattened.

. . . .

[T]he portion of the skull that has been removed and dura which is the membrane which is between the skull and the brain. Here it is shown to be in the lower portion of the picture and it is adhering to that part of the skull that was removed. It contains dark brown, reddish brown material which is blood and that is also present as can be seen over the surface of the brain.

Exhibit 10 is

[T]he inside of the body of Brittany Smith after the internal organs were removed and it shows the inside of the spine and it shows the transverse tear that I was talking about, the eleventh thoracic vertebrae which is the lower spine, and shows very clearly a dark red to brown line across where the tear or fracture is.

Exhibit 11 was described as "one of the hemorrhages in the left flank with an incision I made over it to show the hemorrhage underneath which is the accumulation of blood where it is not supposed to be."

they are illustrative of the testimony and for that reason I believe they are probative, they will assist the jury in understanding the doctor's testimony.

We have reviewed the challenged photographs and although they are indeed graphic and troubling to human sensibility, they were not prejudicial. The photographs depicted exactly what Dr. Hollander described and were undoubtedly helpful in assisting the jury to understand the nature and gravity of the wounds inflicted upon Brittany by Robins. The trial court did not abuse its discretion; the photographs were properly admitted into evidence.

Robins also charges that the evidence was insufficient as a matter of law to sustain his conviction for child abuse with substantial bodily harm. This contention is without merit.

Our review of the record reveals sufficient evidence to support the jury's determination that Robins was guilty of child abuse with substantial bodily harm. Although it may be true that Robins was not present immediately prior to Brittany's treatment for her fractured leg, it was shown by substantial evidence that the infant's leg had been injured by as much as two or three weeks before she was treated. Additionally, the autopsy revealed internal injuries ranging in age from very recent, through various stages of healing, to the formation of scar tissue, which takes approximately six weeks. Further, witnesses testified to observing Robins kick Brittany, put her on a high closet shelf and allow her to fall, pull her arms and legs behind her back, tie her up, and put her in a cold tub of water and hold her face under until she was gasping for breath. All of these actions would create a substantial risk of death or serious bodily injury or, in any event, would certainly cause prolonged physical pain to an eleven-month-old infant.[3]

Robins next argues that the trial court erred by limiting his cross-examination of a State witness. This argument is also without merit.

Robins sought to impeach a witness by delving into unsubstantiated personal matters. The asserted basis for this effort was that

---

[3]The jury was instructed that "substantial bodily harm means (1) bodily injury which creates a substantial risk of death, or which causes protracted loss or impairment of the function of any bodily member or organ; or (2) prolonged physical pain." *See* NRS 0.060.

the witness had a motive to conform her testimony to that of her incarcerated fiance, who also testified. The defense theory ascribed to the witness a motive to fabricate in an effort to secure an early release for her fiance. Nothing in the record supports Robins' assertion that the witness had a motive to perjure herself or that her testimony could prove efficacious on behalf of her fiance. The trial court's constraints were proper. The frustrated cross-examination was founded on speculation and sought merely to elicit testimony that was unrelated, irrelevant and inadmissible. Finally, any error in the court's ruling was harmless beyond a reasonable doubt. The State presented overwhelming evidence of Robins' guilt.

Robins also contends that he was prejudiced when the trial court admonished defense counsel during the cross-examination of State witness Robert Williams. Robins' argument is unpersuasive. The record reflects confusion on the part of Williams during defense counsel's interrogation regarding certain prior testimony. Williams was not certain which transcripts counsel was referring to. The trial court eventually directed counsel to stop referring to the transcripts and to just ask a question. Rather than try a new approach or move on, defense counsel persisted in confusing Williams by referring to the transcripts. Finally, the trial court admonished counsel. In doing so, the trial judge was appropriately controlling the flow of the trial without prejudice to Robins.

### Penalty Phase

Robins alleges that two penalty-phase errors require a reversal of his death sentence. We disagree.

Robins first contends that the trial court erred in admitting certain derogatory character evidence. The challenged evidence is: (1) testimony of events associated with his arrest for the sale of drugs; (2) testimony that Robins was associated with gangs; and (3) testimony about threatening notes received by Lovell McDowell's uncle and brother. Robins seeks to support his claim based on our ruling in Allen v. State, 99 Nev. 485, 665 P.2d 238 (1983). *Allen* held that character evidence is inadmissible in a penalty hearing if it is "dubious or tenuous" or if its "probative value is clearly 'outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.'" *Id.* at 488-89, 665 P.2d at 240. As will be shown hereinafter, *Allen* is readily distinguished from the instant case.

In Nevada, the statutory prescription for admissible evidence at penalty hearings is set forth in NRS 175.552. In pertinent part, the statute reads as follows:

> In the [penalty] hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, *defendant* or victim and *on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.*

(Emphasis supplied.) The evidentiary latitude provided by the referenced statute serves to facilitate the purposes explained by this court in Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985):

> Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics. This process is facilitated by consideration of mitigating circumstances *and other reliable factors relevant to the life of the defendant as a whole person.* Only then may a sentencing authority render an informed judgment based upon the crime and the defendant who committed it.
>
> If the death penalty option survives the balancing of aggravating and mitigating circumstances, *Nevada law permits consideration by the sentencing panel of other evidence relevant to sentence.* NRS 175.552. Whether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge.

*Id.* at 791, 711 P.2d at 862-63 (emphasis added). Here, we are called upon to determine whether the challenged character evidence is "dubious or tenuous" and whether its probative value is outweighed by its prejudicial effect.

## A. *Evidence of Drug Sales*

At the penalty phase, testimony was adduced concerning Robins' alleged involvement in sales of rock cocaine. Robins stresses that any probative value in the testimony was far outweighed by its prejudicial effect on the jury's penalty assessment. Also emphasizing the fact that he was never charged for such crimes, Robins urges us to reject evidence of uncharged crimes in the penalty phase as we do in the guilt phase of trial. Berner v. State, 104 Nev. 695, 765 P.2d 1144 (1988). We reject both contentions.

This court has held that evidence of uncharged crimes may be admitted during the penalty hearing once any aggravating circumstances have been established beyond a reasonable doubt. Crump v. State, 102 Nev. 158, 161, 716 P.2d 1387, 1388 (1986);

*Gallego,* 101 Nev. at 791, 711 P.2d at 863. *See also* Barclay v. Florida, 463 U.S. 939 (1983). In *Crump,* the court allowed testimony by a person who had witnessed the defendant commit a homicide for which he was not yet charged. We determined that the testimony was "neither dubious, tenuous, nor of questionable probative value." 102 Nev. at 161, 716 P.2d at 1388. In *Gallego* we stated that "properly qualified evidence of [the uncharged murders] was highly relevant to meaningful considerations of Gallego's death worthiness." 101 Nev. at 791, 711 P.2d at 863.

The testimony in *Gallego* and *Crump* had greater potential for prejudice than the testimony adduced concerning Robins' involvement in drug sales. Moreover, the testimony here was given by percipient witnesses. In that regard, this case is unlike *Allen,* where a jail employee testified without personal knowledge of defendant's disciplinary problems. The testimony presented here was clearly relevant to Robins' character, and was appropriately considered by the jury in assessing his penalty. The trial court did not abuse its discretion in admitting the evidence of Robins' involvement in the sale of drugs.

### B.  *Evidence of Gang Affiliation*

Robins also challenges the admissibility of testimony connecting him with gang activity. He contends that the evidence was both dubious and tenuous because no testimony was presented that proved his actual involvement with gangs. Although the evidence was somewhat tenuous, there was testimony presented both verbally and by demonstration regarding various "gang signs" used by Robins. The testimony indicated that the signs given by Robins had significance only to gang members. Based upon the detailed testimony presented concerning the use of gang signs by Robins, we are not persuaded that the trial judge abused his discretion in admitting the testimony.

Moreover, the testimony concerning Robins' use of gang signs was far less prejudicial than the testimony we condemned in Young v. State, 103 Nev. 233, 737 P.2d 512 (1987). In *Young* an expert witness testified concerning gangs in the Los Angeles area in general and stated that he had seen the defendant in the company of gang members and had been told that the defendant belonged to a gang. More importantly, the witness testified that the "gang members would do anything, including torture and killing, to exact information about the hiding place of a victim's valuables." *Id.* at 237, 737 P.2d at 515. We concluded in *Young* that the testimony that the defendant was part of a gang that tortured the victims of its crimes was both highly dubious hearsay

and inflammatory. There is little or no similarity between the testimony here and that presented in *Young.*

The testimony challenged by Robins, although somewhat less than compelling, did provide a basis for further insight into his character. On balance, we cannot conclude that its admission was error. In any event, given the overwhelming evidence of Robins' guilt, and his aggravated and inhumane abuse of the tiny victim, any error in admitting this testimony is harmless beyond a reasonable doubt.

## C.  *Testimony of Threatening Notes*

Lastly, Robins contends that McDowell's testimony regarding threatening notes allegedly sent to members of her family is also of a dubious and tenuous nature. We are inclined to agree. Although the testimony was adduced to show Robins' violent propensities, it was based solely on hearsay. McDowell testified that her uncle and brother received the threatening notes. Neither the uncle nor the brother testified; moreover, the notes themselves were not admitted into evidence. Under our ruling in *Young,* the hearsay was probably sufficiently dubious to warrant its exclusion.

If the notes were, in fact, written and sent by Robins, it would appear that evidence could have been presented by the State that would have been more credible. Under the circumstances, the challenged testimony should not have been allowed. We are nevertheless convinced that the error was harmless beyond a reasonable doubt. The portrait of violence painted by Robins himself on the body of his eleven-month-old victim caused any attributions of violence stemming from the testimony concerning the notes to pale in comparison. Viewed as a whole, Robins' entire trial, including the penalty hearing, reflected due regard for fundamental fairness.

Finally, Robins challenges the instructions given at his penalty hearing as unconstitutionally vague.[4] He relies upon Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989), in which the court held

---

[4]The jury instructions at issue read as follows:

*Instruction No. 8:*
You are instructed that the following factor is a circumstance by which Murder of the First Degree may be aggravated: .
(1) The murder involved torture and/or depravity of mind.
*Instruction No. 9:*
Murder which is perpetrated by torture is murder of the first degree. The essential elements of murder by torture are (1) the act or acts

that the depravity of mind instruction failed to meet the require-
ments of Godfrey v. Georgia, 446 U.S. 420 (1980). Robins
contends that because the instruction was unconstitutionally
vague, he is entitled to a reversal of the murder conviction or, in
the alternative, a modification of his sentence to life without the
possibility of parole. Again, we disagree.

Godfrey requires states imposing the death penalty to:

> channel the sentencer's discretion by "clear and objective
> standards" that provide "specific and detailed guidance,"
> and that "make rationally reviewable the process for impos-
> ing a sentence of death."

Id. at 428. The Supreme Court's concern is the avoidance of
death sentences arbitrarily or capriciously imposed. See Furman
v. Georgia, 408 U.S. 238 (1972).

It must first be noted that the statute in Godfrey, which is
similar to our statute, was not determined to be facially unconsti-
tutional. Godfrey, 446 U.S. at 422, citing Gregg v. Georgia, 428
U.S. 153 (1976). The aggravating circumstance at issue in both
Godfrey and Gregg provided:

> The offense [enumerated] was outrageously or wantonly
> vile, horrible or inhuman in that it involved torture, deprav-
> ity of mind or an aggravated battery to the victim.

Gregg, 428 U.S. at 165, n.9; Godfrey, 446 U.S. at 422. Prior to
Godfrey, the statute had been constitutionally applied. The God-
frey court cited Georgia's prior applications of the aggravating
circumstance with approval. In those cases, the Georgia Supreme
Court had construed the aggravating circumstance to require
depravity of mind and either torture or aggravated battery. God-
frey, 446 U.S. at 430-31.

In Godfrey, however, the state court did not affirm the death
sentence under the statute as written and previously construed.

---

which caused the death must involve a high degree of probability of
death, and (2) the defendant must commit such act or acts with the
intent to cause cruel pain and suffering for the purpose of revenge,
persuasion or for any sadistic purpose.

The crime of murder by torture does not necessarily require any
proof that the defendant intended to kill the deceased nor does it
necessarily require any proof that the deceased suffered pain.
Instruction No. 10:

The condition of mind described as depravity of mind is character-
ized by an inherent deficiency of moral sense and rectitude. It consists
of evil, corrupt and perverted intent which is devoid of regard for
human dignity and which is indifferent to human life. It is a state of
mind outrageously, wantonly vile, horrible or inhuman.

Consequently, the *Godfrey* court concluded that as applied in that case, the State had adopted an overly broad and vague construction of the aggravating circumstance. The sentence had been affirmed "based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible or inhuman.'" *Godfrey,* 446 U.S. at 428. The court found that as applied, the aggravating circumstance was unconstitutionally vague because:

> There is nothing in these few words, *standing alone,* that implies any inherent restraint on the arbitrary and capricious infliction of a death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman."

*Godfrey,* 446 U.S. at 428-29 (emphasis added).

*Godfrey* is clearly distinguishable from the instant case. Unlike *Godfrey,* here the imposition of the death penalty is not the "standardless and unchanneled imposition of death . . . in the uncontrolled discretion of a basically uninstructed jury." *Godfrey,* 446 U.S. at 429. The jury instructions at issue here provide objective standards by which an aggravating circumstance may be found. Moreover, those objective standards provide a basis for a rational review by this court of the death sentencing process. As observed by the court in *Deutscher,* "[t]he torture and mutilation aspects of this circumstance are sufficiently clear and objective to satisfy the requirements of *Godfrey.*" *Deutscher,* 884 F.2d at 1162.

The *Deutscher* court's concern was that the "depravity of mind" aspect of the aggravating circumstance was not conducive to the channeling of the jury's discretion as required by *Godfrey.* However, the death sentence here is not solely based upon a "depravity of mind" aspect as it was in *Godfrey.* This case also involves the torture of an eleven-month-old baby under circumstances plainly covered by the instructions to the jury. In Maynard v. Cartwright, 486 U.S. 356 (1988), the court implied that torture or serious physical abuse could be a limiting and saving construction of an otherwise vague aggravating circumstance. *Id.* at 365.

Nevada's aggravating circumstance contains such limiting language. Although Instruction No. 8 specifies torture and depravity of mind in both the disjunctive and conjunctive, we construe the instruction and the statute (NRS 200.033(8)) upon which it is based as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind. In the instant case, the evidence

supplied a cogent basis for the jury's finding of the aggravating circumstance limited in scope by the construction we have placed thereon. In short, the evidence of record which the jury heard and had a right to consider, revealed a tragically abundant presence of both torture and depravity of mind.

It should thus be apparent from our ruling that the "depravity of mind" aspect of the referenced statute is not to be viewed as a receptacle for all other homicides that do not fit within the terms of the aggravating circumstances adopted by our legislature as a basis for imposing sentences of death. Having concluded that the jury was properly and adequately instructed so as to apply a focused judgment on Robins' death worthiness, we decline to interfere with the jury's verdict. As applied to this case, the aggravating circumstance was not unconstitutionally vague.

### Conclusion

In reviewing the overall record, we conclude that Robins' sentence of death was not the result of passion, prejudice or any arbitrary factor and that the sentence was not excessive, considering both the crime and the individual characteristics and background of the defendant. Having determined that Robins was fairly tried, convicted and sentenced, we affirm in all respects the judgments of conviction and sentences imposed thereon.

YOUNG, C. J. and STEFFEN, SPRINGER and ROSE, JJ., and WHITEHEAD, D. J.,[5] concur.