CARLOS GUTIERREZ, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 27469

June 24, 1996

920 P.2d 987

*Michael R. Specchio,* Public Defender, and *John Reese Petty,*
Deputy Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City;
*Richard A. Gammick,* District Attorney, and *Gary Hatlestad,*
Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

On April 21, 1995, appellant Carlos Gutierrez entered a plea of guilty to one count of first-degree murder, pursuant to North Carolina v. Alford, 400 U.S. 25 (1970) and Tiger v. State, 98 Nev. 555, 654 P.2d 1031 (1992). Following a sentencing hearing, the three-judge panel found one aggravator (torture and depravity of mind) and one mitigator (no prior criminal history). The panel determined that the mitigator did not outweigh the aggravator, and sentenced Gutierrez to death. Gutierrez appeals, contending that the death penalty was excessive and imposed under the influence of passion or prejudice and, therefore, the case should be remanded for a new sentencing hearing. We disagree and affirm the three-judge panel's decision.

### FACTS

The victim in this case, three-year-old Mailin Stafford (Mailin), was born on January 29, 1991, and lived with her maternal grandparents until about May of 1993. On December 4, 1992, Tara Gutierrez (Tara), Mailin's mother, married Carlos Gutierrez (Gutierrez) and the two of them moved in with friends. In approximately May of 1993, Tara, Gutierrez and Mailin moved in with Gutierrez's brother, Alfredo, and his family for one month. Whenever Gutierrez caught Mailin sucking her thumb he would spank her with a sandal. On three occasions he required her to hold out her hands to be spanked. Other times he would spank her buttocks or upper legs. The spankings were hard enough to knock Mailin back several steps and bruise her hands.

In June or July 1993, Tara, Gutierrez and Mailin moved in with friends, Carlos and Mindy Lopez, for a week. During that week Gutierrez beat Mailin each day for sucking her thumb. He also fed her hot chilies on at least three occasions in an attempt to get her to stop sucking her thumb. Mailin began wetting the bed, which also prompted Gutierrez to spank her. Mailin had bruises on the buttocks and hands as a result of these beatings.

Tara, Gutierrez and Mailin moved into an apartment on Bravo Street sometime in July or August of 1993.[1] During the same month in August, Tara's parents reported Mailin's injuries to the police. Mailin had bruises on her face, back, lower buttocks, arms, and hands. She was placed in foster care on August 19, 1993, but was returned home on October 13, 1993.

During the first six months in the Bravo Street apartment, Mailin continued to suck her thumb and was beaten by Gutierrez approximately four times a week as a result.[2] Gutierrez continued to force her to eat chili peppers and also forced her to drink Tabasco sauce. The Tabasco sauce caused Mailin to vomit and gave her diarrhea. As punishment for vomiting, Gutierrez compelled her to take cold showers until the child began to drown and turn blue. The first time Gutierrez gave Mailin the shower treatment, Tara found him in the bathroom with blood on his hands. Mailin had blood in her mouth.

The shower treatment became a general discipline method for thumb-sucking or vomiting, and occurred weekly. On one occasion, Gutierrez also forced Mailin to eat her vomit. Eventually, Mailin was able to withstand the cold showers, thus inducing Gutierrez to commence giving the child hot showers. He would also beat Mailin in the bathroom. After being beaten by Gutierrez, Mailin would apologize for being a bad girl and attempt to hug her tormentor. Gutierrez would push her away. Gutierrez would also beat Mailin for not playing with her toys "perfectly."

Beatings included twice punching Mailin in the stomach, causing her to double over in pain and fall to the ground. He also kicked her in the stomach, causing her to fly back several feet.

In May or June 1994, Tara, Gutierrez, Mailin and Tatiana moved into an apartment on Valley Road. During this time, Gutierrez continued the shower treatment. The month prior to her death, Mailin had bruises on her face, arms, legs and hands.

---

[1]On September 23, 1993, Tatiana Gutierrez was born to Tara and Gutierrez.

[2]Mailin stopped sucking her thumb some time in February 1994; nevertheless, the beatings continued.

Mailin died on Wednesday, June 15, 1994. The week prior to her death Mailin vomited frequently, complained of her stomach hurting, and had a hard time keeping her food down. The Friday prior to Mailin's death, Tara and Gutierrez argued. Gutierrez spanked Mailin because he was angry with Tara. He then went to California, returning on Sunday. When he returned, he gave Mailin a cold shower, during which she defecated. Gutierrez made her eat part of her feces. On Monday, Mailin's babysitter noticed a bruise on Mailin's stomach.

On June 15, 1994, Gutierrez came home from work and showered; Mailin threw up and Tara quickly changed her clothes before Gutierrez could notice. After Gutierrez finished his shower, Mailin used the bathroom. Eventually Mailin called for her mother, but Gutierrez responded instead. He ordered her to take off her clothes. Tara heard water running, then heard a loud bang. When Gutierrez and Mailin came out of the bathroom, Tara was in the room crying. Mailin walked out of the bathroom awkward and dizzy, a new bruise forming on her stomach. Upon seeing the child hold her stomach, Gutierrez pushed it. Mailin cringed in pain, and Gutierrez pushed it again. Mailin then quietly played with Tatiana for the next half hour, moving slowly. She then crawled onto Gutierrez's lap and died.[3]

Gutierrez and Tara eventually wrapped Mailin's body in a blanket, drove to a location near Fillmore, California, threw the body into a ravine and returned to Reno, thereafter claiming someone had kidnapped Mailin.

During the penalty hearing, Gutierrez presented testimony of his belief in the supernatural. Two of his sisters testified about his upbringing in Mexico, particularly about the local cultural belief in brujos or witches. Defense counsel noted that Tara and her parents also believed in supernatural occurrences. A scholar in Mexican history, who resides where Gutierrez grew up, testified of the region's widespread belief in witchcraft and supernatural manifestations. However, he also testified that he had never known of children being killed as a result of another's curse. All of his testimony dealt with the person cursed suffering misfortune, illness, or death.

The three-judge panel found torture and depravity of mind as an aggravating circumstance, and Gutierrez's lack of a significant criminal history as a mitigating circumstance. The panel specifically found that the murder was not committed while Gutierrez was under the influence of extreme mental or emotional disturbance. Finally, the panel found that the mitigating circumstance

---

[3]Either immediately before or after Mailin died, Gutierrez told Tara "I can do this to you too," which Tara understood to mean he could kill her too.

did not outweigh the aggravating circumstance, and sentenced Gutierrez to death.

## DISCUSSION

Gutierrez contends that the evidence does not support or warrant a sentence of death and that his sentence was the result of passion or prejudice on the part of the panel. We disagree. The incidents leading to Mailin's death present a parade of horrors, which were neither isolated nor the product of a sudden act of rage. This court has upheld death sentences in similar cases. *See* Powell v. State, 108 Nev. 700, 838 P.2d 921 (1992); Robins v. State, 106 Nev. 611, 798 P.2d 558 (1990) *cert. denied* 499 U.S. 970 (1991); Lopez v. State, 105 Nev. 68, 769 P.2d 1276 (1989).

The medical examiner testified that the pain from the internal injuries would have been protracted and excruciating, similar to the pain suffered from a burst appendix. Indications of serious internal injuries, vomiting and bruises on the abdomen, were present for up to a week prior to Mailin's death.

The repeated beatings and other acts of torture suffered by the child-victim, resulting in extensive injuries, reflect a magnitude of ongoing violence totally beyond the realm of "discipline." By the time Mailin's life mercifully ended, her injuries were comparable to those received in a high velocity automobile accident. There is no indication that Gutierrez sought to temper his brutality by providing medical attention or love. Mailin's efforts to seek her stepfather's love after the beatings were callously rebuffed. When Tara cried too loud over the abuse on the day Mailin died, Gutierrez kicked her and hit her. Aside from the beatings, Gutierrez's methods of administering what he euphemistically characterized as discipline were clearly sadistic acts of torture: subjecting her to freezing cold and scalding hot showers, forcing her to eat hot sauce and chili peppers, and forcing the child to eat her own vomit and feces.

The overwhelming evidence revealed that Gutierrez personally inflicted the vast majority of the punishment on the suffering child, and that he administered the deathblow. Any ostensibly affectionate conduct by Mailin towards Gutierrez, such as her climbing onto his lap to die after he had beaten her, more cogently reflected a poignant fear of future violence and a pitiable attempt to ameliorate it, than respect for any virtue attributable to Gutierrez as a parent figure.

Gutierrez next claims that the three-judge panel's finding that he was not under the influence of extreme mental or emotional disturbance demonstrates that the panel acted under the influence

of passion or prejudice. Gutierrez thus impliedly suggests that because his beliefs were foreign to the panel, the panel rejected the possibility that his beliefs were genuine.[4]

We conclude that the panel did not err in rejecting the emotional disturbance claim as a source of mitigation. *See* Farmer v. State, 101 Nev. 419, 421-22, 705 P.2d 149, 151 (1985), *cert. denied,* 476 U.S. 1130 (1986) (after considering the offered evidence, three-judge panel may reasonably find that proposed mitigating circumstance does not exist). Gutierrez failed to present evidence that would indicate his beliefs caused him to kill Mailin. There was some evidence that Gutierrez believed the Bravo Street apartment was cursed, but the murder occurred in the Valley Road apartment a month after he and his family moved out of the Bravo Street apartment. Although there was also an indication that Gutierrez at times saw Mailin as a fire-breathing monster, there was no evidence at all to connect that alleged illusion to the beatings. Rather, the evidence indicated that the beatings were connected to Mailin's thumb sucking, bed wetting and general inability to please her stepfather.

We also conclude that the panel did not err in rejecting Gutierrez's other proposed mitigator—that he was a good child and provided for his family in Mexico. Although the panel members may have viewed such distant background as a positive factor in Gutierrez's life, the panel was under no obligation to accord it substantial currency in the form of a mitigating circumstance to the callous beatings and torture inflicted on his stepdaughter.

Gutierrez also insists that since the panel found depravity in conjunction with its finding of torture as an aggravating circumstance, his sentence cannot stand. In rendering the sentence, the panel stated that "the murder included torture and depravity of mind." The panel also stated, "the defendant's depravity of mind included torture and other serious and depraved physical abuse beyond the act of killing itself." It further stated, "we find and

---

[4]Gutierrez also briefly contends that since the panel only found one mitigating factor, then it must have found only the one upon which they unanimously agreed. He insists that at least one of the judges must have found the emotional disturbance mitigator to exist and, thus, the sentence cannot stand. However, nothing in the record suggests that the members of the panel believed that unanimity was required for a mitigating circumstance to exist or to be considered by any member of the panel. Moreover, nothing in the record indicates that any one of the members of the panel considered Gutierrez's belief in the supernatural to be a mitigating factor.

conclude that the mitigating circumstance does not outweigh *either* the torture *or* the depravity of mind aspect of the aggravating circumstances found.''[5]

This court has expressed concern with the use of the depravity of mind aggravator, because it may not channel the sentencer's discretion appropriately. *See Robins,* 106 Nev. at 629, 798 P.2d at 570. In *Robins,* the court interpreted the depravity of mind aggravator to mean "torture, mutilation, or other serious and depraved physical abuse beyond the act of killing itself." *Id.*

In the instant case, the panel clearly used the limiting construction of the depravity of mind aggravator in imposing the death penalty. We therefore conclude that Gutierrez's argument that the sentence was imposed under influence of passion or prejudice is without merit.

Although unraised by Gutierrez as an issue, NRS 177.055(2)[6] requires this court to examine the record and determine whether the evidence supports the finding of the aggravating circumstance. We have examined the record, and conclude that there was sufficient evidentiary support for the panel's finding. As noted above, the incidents leading to Mailin's death were neither isolated, nor the product of sudden acts of rage. Not only was Mailin allowed to suffer through vomiting and stomach pains during the last week of her life without resort to any treatment, she was forced to eat her feces and was further beaten by Gutierrez during that week, such that she had sustained over thirty external bruises from head to toe along with severe internal injuries. This conduct, combined with the brutal beatings to which Mailin had been repeatedly subjected over the last year of her life, support the panel's finding of torture and other serious and depraved physical abuse beyond the act of killing itself.

Finally, we are enjoined by NRS 177.055(2)(c) and (d) to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor;" and

---

[5]The panel recognized that Senate Bill 374 repealed the depravity of mind aggravator, but noted that they were not bound by the repeal because the new law would not take effect until October 1995.

[6]NRS 177.055(2) states:

Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:

. . . .

(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances.

"[w]hether the sentence of death is excessive, considering both the crime and the defendant." After a careful review of the record, and consideration of both the crime and the appellant, Gutierrez, we conclude that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor, and that the death sentence was not excessive.

## CONCLUSION

For the reasons discussed above, we affirm the three-judge panel's decision sentencing Gutierrez to death.