# IN THE SUPREME COURT OF THE STATE OF NEVADA

CHARLES LAMONT ROBINS A/K/A
HA'IM AL MATIN SHARIF,
Appellants,
vs.
THE STATE OF NEVADA,
Respondent.

No. 65063

FILED

SEP 2 2 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## *ORDER AFFIRMING IN PART, REVERSING IN PART AND REMANDING*

This is an appeal from a district court order denying a postconviction petition for a writ of habeas corpus in a death penalty case. Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

Appellant Charles Robins was convicted of first-degree murder and child abuse stemming from the physical abuse and death of Brittany Smith, who was the daughter of his live-in girlfriend, Lovell McDowell. At the conclusion of the penalty hearing, the jury found one aggravating circumstance—the murder involved torture, depravity of mind, and mutilation of the victim—and sentenced him to death.[1] We affirmed the judgment of conviction and death sentence on appeal. *Robins v. State*, 106 Nev. 611, 798 P.2d 558 (1990). Thereafter, Robins unsuccessfully sought postconviction relief. *Robins v. State*, Docket No. 48301 (Order of Affirmance, January 20, 2009); *Robins v. State*, Docket No. 31054 (Order Dismissing Appeal, November 24, 1998); *Robins v. State*, Docket No. 23421 (Order of Remand, May 27, 1993).

---

[1]Robins received a 20-year prison sentence for the child abuse conviction.

16-29520

Robins filed the postconviction petition underlying this appeal on August 30, 2013. *See also Robins v. Baker*, 2013 WL 5947343 (D. Nev. Nov. 5, 2013). Because the petition was filed approximately 23 years after this court issued its remittitur on direct appeal and he had previously filed two other postconviction petitions, the petition was untimely under NRS 34.726(1) and successive under NRS 34.810(2). Accordingly, for the petition to be considered on the merits, Robins had to demonstrate good cause and prejudice, NRS 34.726(1); NRS 34.810(3).

Robins contends that he demonstrated good cause and prejudice to overcome the default based on ineffective assistance of postconviction counsel and recently discovered evidence of improper communications between the bailiff and the jury, but we disagree. Because the appointment of postconviction counsel was not mandatory at the time his first petition was filed, *see* 1991 Nev. Stat., ch. 44, §§ 20 and 32, at 87, 92, and therefore he did not have the right to the effective assistance of postconviction counsel, *see Bejarano v. Warden*, 112 Nev. 1466, 1470 n.1, 929 P.2d 922, 925 n.1 (1996); *McKague v. Warden*, 112 Nev. 159, 165 n.5, 912 P.2d 255, 258 n.5 (1996), the ineffective assistance of postconviction counsel cannot serve as good cause to overcome the procedural bars, *Pellegrini*, 117 Nev. at 887-88, 34 P.3d at 537-38. And nothing in the record suggests that Robins was precluded from investigating any potential jury matters sooner and therefore he has not demonstrated good cause; nor has he satisfied the prejudice component, as he has not shown that an average hypothetical juror would have been influenced by the bailiff's comments, *see Meyer v. State*, 119 Nev. 554, 566, 80 P.3d 447, 456 (2003). We therefore conclude that the district court properly rejected those good-cause claims.

Robins also asserts as good cause that the State's withholding of exculpatory and impeachment evidence and failure to correct McDowell's allegedly false testimony violated *Giglio v. United States*, 405 U.S. 150, 153 (1972), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A meritorious claim that the State withheld material evidence favorable to the defense or knowingly presented false testimony may establish good cause if the petitioner raises the claim "within a reasonable time after the withheld evidence was disclosed or discovered by the defense." *State v. Huebler*, 128 Nev. 192, 198 n.3, 275 P.3d 91, 95 n.3 (2012). Because the merit of this claim is influenced by our decision regarding his gateway actual-innocence claim, we will take it up after our discussion of the gateway actual-innocence claim.

Robins contends that his defaulted claims must be considered on the merits to avoid a fundamental miscarriage of justice. A fundamental miscarriage of justice sufficient to excuse the procedural bars requires "a colorable showing" that he is "actually innocent of the crime or is ineligible for the death penalty." *Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001). When claiming a fundamental miscarriage based on actual innocence of the crime, the petitioner "must show that it is more likely than not that no reasonable juror would have convicted him absent a constitutional violation." *Id.* In this context, "[a]ctual innocence means factual innocence, not mere legal insufficiency." *Mitchell v. State*, 122 Nev. 1269, 1273-74, 149 P.3d 33, 36 (2006) (internal quotation marks omitted). When claiming a fundamental miscarriage of justice based on ineligibility for the death penalty, the petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable

juror would have found him death eligible." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537.

Robins argues new medical evidence shows that Brittany had a disease that explains her injuries and death and had trial counsel discovered and presented this evidence, the jury would not have convicted him of first-degree murder and child abuse or imposed death.[2] He seeks an evidentiary hearing on whether he is actually innocent so that he may pass through the actual-innocence gateway and have his procedurally defaulted claims heard on the merits. To secure an evidentiary hearing, Robins must present "specific factual allegations that, if true, and not belied by the record, would show that it is more likely than not that no reasonable juror would have convicted him [or found him death eligible] beyond a reasonable doubt given the new evidence." *Berry v. State*, 131 Nev., Adv. Op. 96, 363 P.3d 1148, 1155 (2015); *see Mann v. State*, 118 Nev. 351, 354, 46 P.3d 1228, 1230 (2002). To support his actual-innocence claim and request for evidentiary hearing, Robins primarily relies on declarations from two experts.

---

[2]Robins also asserts other allegations of actual innocence to establish a fundamental miscarriage of justice. He argues that the district court erred by denying his claim that he is actually innocent of the death penalty because trial counsel was ineffective for not discovering and presenting additional mitigation evidence. However, a claim of actual innocence of the death penalty offered as a gateway to a procedurally defaulted claim cannot be grounded in new evidence of mitigating circumstances. *See Lisle v. State*, 131 Nev., Adv. Op. 39, 351 P.3d 725, 734 (2015). As to his claims that the district court erred by denying his actual-innocence claims based on the bailiff's improper communication with the jurors and cumulative error, we conclude that those claims lack merit. Therefore, the district court properly denied these claims.

The first declaration is from Dr. Patrick Barnes, who has extensive experience in diagnostic radiology and neuroradiology and, more specifically, pediatric neuroradiology. A subset of his experience and training in pediatric neuroradiology falls into the area of child abuse and child protective services. Dr. Barnes has served as chief of neuroradiology/pediatric neuroradiology at various hospitals and for many years, he served as a neuroradiology consultant to child protective services agencies in Massachusetts and California. In this case, Dr. Barnes reviewed Brittany's medical records, including radiographic images of her right leg fracture and images of her left leg (not associated with any fracture). He noted that the images "revealed multiple classic images typical of those seen in children with scurvy (Barlow's Disease)" and concluded that the images "were highly suggestive of vitamin C deficiency/depletion with scurvy (Barlow's Disease)." In addressing Brittany's right leg fracture, he explained that "[a] particular type of hemorrhage known as sub-periosteal hemorrhage is associated with fractures in children with scurvy." Brittany's images showed a significant hematoma on her right leg and a fracture that transected the sub-periosteal callus (new bone formation) at the site of the hematoma. Dr. Barnes explained that this new bone formation appears "identical to the type of healing that occurs after a fracture" but continued to opine that, "The fact that the fracture line extend[ed] through the callus suggest[ed] that the callus formed as a result of sub-periosteal hemorrhage commonly seen in children with scurvy." The knot and swelling reported in Brittany's right leg were also consistent with scurvy-associated hemorrhaging. Dr. Barnes then went on to explain that other injuries noted in the autopsy are consistent with symptoms of scurvy, such as discolorations or bruising on the body and internal hemorrhages, which

can occur throughout the body because scurvy weakens blood vessels. Additionally, Dr. Barnes explained that scurvy could impede collagen formation (necessary for healthy bones) in a child's spine and that left untreated, scurvy can result in death, including sudden death. Dr. Barnes noted that the classic signs of abnormal bone formation associated with scurvy were well documented in the medical literature by 1988. Dr. Barnes concluded his affidavit by stating, "My opinions in this case are held to a reasonable degree of medical certainty and based on my clinical, teaching, and research experience in Pediatric Neuroradiology over the past 35 years."

The second declaration is from Dr. John Plunkett who has extensive experience in general and forensic pathology. He is certified by the American Board of Pathology in the areas of anatomical, clinical, and forensic pathology. During his career, Dr. Plunkett has performed more than 3,000 autopsies, including 200 on children under the age of two. He has taken a special interest in infant head injury and has performed autopsies on children whose deaths were the exclusive result of inflicted head trauma. After reviewing Brittany's medical records, various court records, and Dr. Barnes' declaration, Dr. Plunkett agreed with Dr. Barnes' conclusions that scurvy can cause (1) hemorrhaging throughout the body, (2) weaken or impede collagen formation throughout the body, and (3) sudden death "induced by subdural hemorrhaging and cerebral edema, secondary to the weakened blood vessels associated with scurvy." He concluded that Brittany appeared to have had a closed-head impact injury that caused her death and that "scurvy played a significant if not required role in causing her death." Dr. Plunkett further opined that improperly performed CPR may have caused Brittany's acute thoracic and abdominal injuries and the lower thoracic cord subdural hemorrhage. As to the

scarring surrounding the left ureter and rectum, Dr. Plunkett indicated that it was difficult to discern whether that was evidence of a previous traumatic injury or disease but "the absence of injury to the surrounding organs suggests a natural disease process rather than an inflicted injury." The small bruises on the scalp were consistent with Robins' testimony as to his resuscitation efforts of placing Brittany in a sink to splash water on her face.

The State presented testimony at trial from witnesses who swore they observed Robins abuse Brittany. But their testimony conflicted with other evidence showing that Brittany was examined by medical professionals, police officers, and child abuse investigators at least four times between February and March 1988—the timeframe the eyewitnesses claimed they observed the abuse—and none of those individuals found any visible signs of abuse. Unusual discolorations were observed on Brittany's skin—discolorations that, according to Dr. Barnes, were consistent with scurvy. Further, most of the abuse eyewitnesses did not see Brittany in the weeks preceding her death on April 19, 1988. The medical evidence was the linchpin of the State's theory that Robins physically abused Brittany (causing substantial bodily harm and death), that her killing was premeditated and deliberate, and that the abuse amounted to torture making him eligible for the death penalty. That linchpin is undermined by the new evidence that Brittany may have had scurvy, which, if true, raises questions about the nature and cause of her injuries and death. In particular, Brittany's broken leg played a significant role in the State's efforts to prove Robins abused and killed her with the mens rea required to sustain his first-degree murder conviction and sentence of death. Thus, Dr. Barnes explained that the knot and swelling in Brittany's leg that was reported in early February 1988 was

consistent with a scurvy-associated sub-periosteal hemorrhage that likely caused her leg to spontaneously break later that month. That evidence controverts the medical examiner's trial testimony that Brittany had suffered a fracture at the beginning of February 1988 and a re-break of the leg later that month. Dr. Barnes' conclusions coupled with evidence that Robins was not present when Brittany's leg broke in late February significantly undercuts the State's theory that Robins caused that injury. Dr. Barnes' and Dr. Plunkett's conclusions concerning the possible effects of scurvy on a child's spine provide a cause for Brittany's broken back that contradicts the medical examiner's opinion that significant blunt force trauma caused that injury. The new evidence also explains other injuries on which the State heavily relied to make its case that Robins physically abused and murdered Brittany, including bruises on her body and scalp, her internal abdominal injuries, and the subdural hemorrhage and brain swelling.

The State suggests that Robins' actual-innocence claim should be rejected because he raised a similar actual-innocence claim in a previous postconviction petition, where he asserted that trial counsel was ineffective for failing to present evidence of shaken baby syndrome. Robins had argued that such evidence would have shown that Brittany's death was accidental and a result of his attempts to revive her by shaking her and attempting CPR. Robins' actual-innocence claim based on shaken baby syndrome is not comparable to the actual-innocence claim presented here. In his previous petition, he put forth a witness who was not a qualified expert on shaken baby syndrome. *Robins v. State*, Docket No. 48301 (Order of Affirmance, January 20, 2009), at 5. Further, the expert failed to consider Brittany's injuries, including blunt force trauma, as it related to her opinion that Brittany died from shaken baby syndrome. *Id.*

at 6. In contrast, Dr. Barnes and Dr. Plunkett possess credentials and experience germane to Robins' assertion that Brittany died from scurvy, a disease known to mimic child abuse. Further, their opinions detail Brittany's injuries and explain how they are consistent with abnormalities found in children suffering from scurvy. Under these circumstances, we find no basis to reject Robins' actual-innocence claims on the ground that he presented a similar claim in his previous postconviction petition.

The State further suggests that Robins' actual-innocence claims lack merit because his new medical evidence does not establish that scurvy was the superseding or sole cause of Brittany's death. But this is not determinative. Robins' actual-innocence claims focus in significant part on the proposition that scurvy predisposed Brittany to spontaneous bleeding and bony fractures such that a reasonable juror would not infer from those injuries the premeditation and torture required to sustain Robins' first-degree murder conviction and sentence of death. Intention and causation are distinct legal concepts. *Cf. Brackett v. Peters*, 11 F.3d 78, 81-82 (7th Cir. 1993) ("The eggshell-skull principle does not quite fit a case of intentional murder, for the murderer must intend his victim's death and ordinarily this will presuppose some awareness of the likely consequences of his act. It is not murder to kill a person by a slight blow harmless to an ordinary person if you do not know the person is unusually vulnerable. . . .").

The compelling nature of the new medical evidence raises concerns regarding Robins' claim that the State violated *Brady*, *Giglio*, and *Napue*. This claim relates to McDowell's declaration asserting that she lied to the jury because the prosecutors and police had threatened and intimidated her by repeatedly telling her that she would go to prison and lose custody of her three children if she did not testify in a particular way.

SUPREME COURT
OF
NEVADA

(O) 1947A

9

McDowell indicated in her declaration that she never observed Robins abuse Brittany. Robins has also introduced a declaration from McDowell's brother, Otha McDowell in which Otha indicated that the prosecutors advised McDowell how to craft her trial testimony. Although considered alone this claim does not warrant an evidentiary hearing, McDowell's retraction of her trial testimony that Robins abused Brittany takes on added significance when considered in conjunction with the new medical evidence indicating that Brittany suffered from a disease that could explain her injuries and death.

We are satisfied that Robins has presented specific factual allegations that, if true, would show that it is more likely than not that no reasonable juror would have convicted him of first-degree murder and child abuse beyond a reasonable doubt or found the single aggravating circumstance used to make him death eligible. Therefore, the district court abused its discretion by denying Robins an evidentiary hearing on his gateway claims of actual innocence and his good-cause claim related to the State's alleged violations of *Brady*, *Giglio*, and *Napue*. We therefore remand this matter for an evidentiary hearing on those claims.[3] Accordingly, we

---

[3]The district court also denied Robins' petition based on NRS 34.800. Although this court has indicated that application of the procedural bar in NRS 34.800 is mandatory, *see State v. Eighth Judicial Dist. Court (Riker)*, 121 Nev. 225, 231, 112 P.3d 1070, 1074 (2005), the statute clearly uses permissive language, NRS 34.800(1) ("[a] petition *may* be dismissed" (emphasis added)); *see also* Hearing on A.B. 517 Before the Assembly Comm. on Judiciary, 63d Leg. Ex. D (Nev., May 7, 1985) ("[T]he language of the subdivision, 'a petition may be dismissed,' is permissive rather than mandatory. This clearly allows the court which is considering the petition to use discretion in assessing the equities of the particular situation." (internal parenthetical omitted) (quoting 28 U.S.C. foll. § 2254, Rule 9

*continued on next page . . .*

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

_____, C.J.
Parraguirre

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Cherry

_____, J.
Pickering

cc:    Hon. Kathleen E. Delaney, District Judge
Federal Public Defender/Dist. of AZ
Guymon & Hendron, PLLC
Attorney General/Carson City
Clark County District Attorney
Dickinson Wright PLLC
Davis Polk & Wardwell, LLP
Eighth District Court Clerk

---

. . . *continued*

(1982) (effective January 14, 1983))). As the district court already determined, Robins has not demonstrated the reasonable diligence required to rebut the presumption of prejudice under NRS 34.800(1)(a). But if the district court determines after an evidentiary hearing that Robins' gateway actual-innocence claim has merit and excuses the procedural bars, then Robins will have rebutted the presumption of prejudice under NRS 34.800(1)(b). In these circumstances, where the petitioner has shown a fundamental miscarriage of justice, we believe the district court could exercise its discretion and decline to dismiss the petition under NRS 34.800.