EDWARD LEE BEETS, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20694

December 20, 1991                    821 P.2d 1044

[Rehearing denied March 3, 1992]

*Morgan D. Harris,* Public Defender and *Stephen J. Dahl,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney and *Daniel M. Seaton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, Mowbray, C. J.:

Appellant Edward Beets was Vanita Hames' boyfriend for approximately four months. Sometime after Christmas 1988, Vanita broke off her relationship with appellant. Vanita lived in North Las Vegas with her mother, Oretha Hames, aged 71, her daughter, Nicole, aged 7, and her son, Christian, aged 1½.

At approximately 3:00 or 4:00 a.m. on March 10, 1989, Vanita awoke to find appellant standing over her. Vanita asked appellant what he was doing there and, when he did not reply, she ran out of her room to the kitchen to use the telephone. The telephone did not work as the telephone lines leading into the home had been cut.

Vanita then saw appellant walk toward her, enter her bedroom, and re-emerge with a pillowcase which had been in the linen closet. Appellant withdrew a hammer from the pillowcase, which Vanita recognized as one she kept in a kitchen drawer with other tools. Appellant chased Vanita through the living room, caught her and hit her on her back two or three times with the hammer. Vanita heard her mother, Oretha, yell, "What's going on in there." Oretha then opened her bedroom door, saw appellant, and told him to stop and get out. When Oretha walked toward appellant, he hit her with the hammer once on the top part of her body and she fell.

Vanita crawled around the furniture in an attempt to get away from appellant, but he caught up with her in the hallway and dragged her into the bathroom. Vanita was crying and screaming and appellant told her to be quiet before she woke up the children. Vanita could hear her mother moaning and having difficulty breathing. Inside the bathroom, appellant again hit Vanita with the hammer, including a blow to the back and a blow which broke her arm. Appellant then tied Vanita's hands and feet with a torn

sheet and then left, closing the door. Vanita was unable to get loose from the bindings.

About ten minutes later, appellant returned to the bathroom with a sofa cushion which he placed under Vanita's broken arm. Appellant then untied her, opened his fly, and took off her underpants. Appellant knelt between Vanita's legs and waved the hammer around as if he was going to hit her between her legs. He then turned the end of the hammer around and stuck the handle up her vagina.

Appellant left the bathroom with the door open and returned about a minute later with a kitchen knife. Appellant told Vanita he was going to kill her and then himself. Appellant knelt in front of her and, with both hands on the knife, stabbed her near her left breast. Appellant threw the knife down, turned off the bathroom light, and left, closing the door.

About ten minutes later, Vanita heard appellant walk toward the children's room. Vanita felt around for the knife, left the bathroom, and lunged at appellant with the knife. Appellant knocked the knife out of her hand and hit her across the face with his fist. He again dragged Vanita to the bathroom, pushed her down and, with the hammer, hit her on the knees and on the side of her head. Appellant closed the bathroom door and left. After a few minutes, Vanita heard her daughter crying and heard her say, "No, no."

Vanita got up and went to her daughter's room and found Nicole lying on the bed with her ankles tied. Vanita went into the kitchen to get a knife to cut the bindings. Vanita gave the knife to Nicole, who cut the bindings, and told Nicole to go to a neighbor's house for help. Vanita then went into the living room where she found her mother lying face down on the floor. She turned her over and knew she was dead.[1]

Nicole testified regarding appellant's acts in her bedroom. Appellant entered Nicole's bedroom with no clothes on. He climbed into bed with Nicole and removed her underwear. Appellant then laid on top of Nicole and stuck his finger and penis in her vagina. Appellant left the room and returned a few seconds later and tied her arms and legs. Appellant then left again.

As a result of her injuries, Vanita still could not lift her wrist at trial on August 1, 1989, due to nerve damage. Vanita testified she did not know if she would be able to use her wrist again.

Appellant was charged with the following: burglary; first degree murder with use of a deadly weapon, victim 65 years of age or older; attempted murder with use of a deadly weapon;

---

[1]Clark County Medical Examiner Dr. Nina Hollander performed the autopsy on Oretha and labeled the cause of death as "multiple blunt trauma and stab wounds of the head and neck."

mayhem with use of a deadly weapon; first degree kidnaping with use of a deadly weapon; sexual assault with use of a deadly weapon; and two counts of sexual assault with a minor.

At the close of the State's case at trial, appellant moved to dismiss the kidnaping and mayhem charges. The district court denied the motion as to both charges. The jury found appellant guilty on all counts. At the penalty hearing, the State introduced two judgments of conviction, one for robbery in April 1980, and one for burglary in April, 1985. The defense called witnesses who testified that appellant suffered several serious head wounds as a child and testified regarding appellant's good character.

The jury was deadlocked and unable to reach a verdict after the penalty phase. In an order filed August 15, 1989, we ordered a three-judge panel to conduct a penalty hearing pursuant to NRS 175.556.[2] At the second penalty hearing, the judges indicated that they had reviewed the transcripts of the previous proceedings, both the guilt and penalty phases.

The three-judge panel found no mitigating circumstances and the following four aggravating circumstances: (1) the murder was committed by the defendant while under a sentence of imprisonment, to wit: Burglary; (2) the murder was committed by the defendant who was previously convicted of a felony involving the use or threat of violence to another, to wit: Robbery; (3) the murder was committed while the defendant was engaged in the commission of sexual assault; and (4) the murder was committed while the defendant was engaged in the commission of burglary. On November 7, 1989, appellant was sentenced to death.

On appeal, appellant contends: (1) insufficient evidence of premeditation was presented to support the conviction of first degree murder; (2) the district court erred in denying his motion to dismiss the kidnaping charge; (3) insufficient evidence was presented to support the mayhem conviction; (4) the reasonable doubt instruction was unconstitutional; and (5) three of the aggravating circumstances provided to the jury were improper and constituted prejudicial error. For the reasons stated below, we conclude that all of appellant's contentions lack merit.

Appellant first contends that the evidence adduced at trial was

---

[2]NRS 175.556 states in pertinent part:

> If a jury is unable to reach a unanimous verdict upon the sentence to be imposed, the supreme court shall appoint two district judges from judicial districts other than the district in which the plea is made, who shall with the district judge who conducted the trial, or his successor in office, conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly.

insufficient to support the first degree murder conviction because there was insufficient evidence as to the required element of premeditation. *See* Hern v. State, 97 Nev. 529, 532, 635 P.2d 278, 280 (1981). *See also* NRS 200.030(1)(a). We have previously stated that the time lapse between the premeditation and deliberation and the act of killing "need only be an instant." Scott v. State, 92 Nev. 552, 555, 554 P.2d 735, 737 (1976). We conclude that a jury, acting reasonably, could have been convinced beyond a reasonable doubt that appellant killed Oretha with premeditation. Wilkens v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).

Appellant next contends the district court erred when it denied his motion to dismiss the first degree kidnaping charge. Appellant argues that he was charged with kidnaping Vanita for the purposes of committing sexual assault, pursuant to NRS 200.310, and contends that the movement or asportation of Vanita was incidental to the physical attack against her.

In Clem v. State, 104 Nev. 351, 760 P.2d 103 (1988), *overruled on other grounds* Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990), we concluded that the physical restraint of the victim is sufficient to establish kidnaping as an additional offense. Moreover, we further stated: "[t]he kidnaping was not incidental to the extortion because the restraint increased the risk of harm. Finally, the restraint had an independent purpose and significance as it was essential to the accomplishments of mayhem." *Id.* at 354, 760 P.2d at 105. We thus conclude that the act of binding Vanita's hands and feet was sufficient evidence to establish the kidnaping charge since these acts increased the risk of harm to Vanita and had independent significance with regard to appellant's ability to commit the sexual assault.

Appellant next contends there was insufficient evidence adduced at trial to support the mayhem conviction because there was no evidence presented that Vanita's arm injury was permanent. NRS 200.280 states in pertinent part that "[m]ayhem consists of unlawfully depriving a human being of a member of his body, or disfiguring or rendering it useless. If any person cuts out or disables the tongue . . . or disables any limb or member of another . . . that person is guilty of mayhem . . . ."

Appellant argues the only evidence presented regarding the injury was Vanita's testimony that she had nerve damage and had not regained full ability to lift her wrist at the time of trial. We have previously stated: "Whether the victim is disfigured, and whether the disfigurement is permanent, are questions of fact for the jury." Lomas v. State, 98 Nev. 27, 29, 639 P.2d 551, 552

(1982). We conclude that the jury had sufficient evidence to find that Vanita's injuries were permanent. *See Wilkens,* 96 Nev. at 374, 609 P.2d at 313 (1980).

Appellant next contends that Jury Instruction No. 32, which instructed the jury on reasonable doubt, is unconstitutional.[3] We recently upheld the identical instruction in Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991). We decline appellant's invitation to re-examine our holding in *Lord.*

Finally, appellant challenges the instructions regarding three aggravating circumstances that were given to the jury during the first penalty hearing. We conclude that there was no prejudicial error.

Jury Instruction No. 46 contained the aggravating circumstances alleged by the State. Alleged aggravating circumstance No. 1 stated that the "murder was committed by a person under sentence of imprisonment, to wit: Robbery." In support of this allegation, the State offered two judgments of conviction during the penalty phase: an April 1980 robbery conviction and an April 1985 burglary conviction.

At the second penalty hearing before the three-judge panel, the State again offered the aggravating circumstance. At that time, the court pointed out that a pre-sentence report, previously admitted during that proceeding, indicated the robbery conviction had expired on July 18, 1987. Upon motion of the State, the court then amended the instructions to read "to wit: Burglary."

Appellant contends that, since he was not under a sentence of imprisonment for robbery when he committed the murder, the court erred in giving Jury Instruction No. 46. We conclude that the error was harmless beyond a reasonable doubt. *See* Chapman v. California, 386 U.S. 18 (1966). Appellant was under a sen-

---

[3]Jury Instruction No. 32 states:

The defendant is presumed to be innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty.

tence of imprisonment for burglary. Three other aggravating circumstances were present. There were no mitigating circumstances. Appellant's crimes were brutal and heinous. Considering all of these circumstances, we cannot believe that the jury might have returned an acquittal but for the instructional error.

Aggravating Circumstance No. 3 in Jury Instruction No. 46 stated that "[t]he murder was committed while the person was engaged in the commission of or an attempt to commit any sexual assault." Appellant contends that the aggravating circumstance is unsupported by the evidence because, although appellant did commit a sexual assault, he did not kill the sexual assault victim. We conclude that NRS 200.033(4) does not require the sexual assault to be perpetrated against the homicide victim.

NRS 200.033(4) authorizes an aggravating circumstance for murder committed in the commission of the following crimes: robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnaping in the first degree. *See id.* Nothing in the statute implies that the victim of the robbery, kidnaping, or sexual assault must be the homicide victim. Rather, the statute is intended to punish defendants who commit a murder while in the commission of certain inherently dangerous felonies.

In the present case, appellant murdered Oretha Hames in the commission of a sexual assault against Vanita. Since NRS 200.033(4) is not limited to cases involving sexual assaults perpetrated against the homicide victim, the instruction regarding Aggravating Circumstance No. 3 was proper.

Appellant lastly contests the validity of the aggravating circumstance based upon depravity of mind.[4] Appellant's contention has merit.

This court recently addressed the constitutionality of an aggravating circumstance based upon depravity of mind. *See* Robins v. State, 106 Nev. 611, 798 P.2d 558 (1990), *cert. denied,* ___ U.S. ___ (1991). In *Robins,* we construed NRS 200.033(8) as requiring "[t]orture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement

---

[4]NRS 200.033(8) states that an aggravating circumstance may be found where "[t]he murder involved torture, depravity of mind or the mutilation of the victim." Jury Instruction No. 47 states:

The condition described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

to an aggravating circumstance based in part upon depravity of mind." *Id.* at 629, 798 P.2d 570. *Accord* Jimenez v. State, 106 Nev. 769, 801 P.2d 1366 (1990). Since no factual predicate for a finding of torture, mutilation or depraved physical abuse existed beyond the killing of the victim by a blow with a hammer, we are forced to conclude that the aggravating circumstance based upon depravity of mind must fail.

Despite our rejection of the aggravating circumstance based upon depravity of mind, we are convinced that the sentence of death should stand because of the weight properly accorded to the remaining, valid aggravating circumstances. The murder was committed in basic conjunction with a brutal sexual assault. Also, at the time of the murder, appellant was under sentence of imprisonment for burglary. Considering these circumstances, and the lack of any mitigating circumstances whatsoever, we conclude that the infirm aggravating circumstance based upon depravity of mind is harmless beyond a reasonable doubt.

Appellant's remaining contentions are meritless.[5] We therefore affirm appellant's conviction and sentence of death.

SPRINGER, J., concurring:

I concur in the majority's result in affirming the conviction in this case. With regard to the penalty hearing, I again concur with the majority's result, but for different reasons from those stated in the majority opinion.

The sentencing panel concluded that there were no mitigating circumstances and that there were four aggravating circumstances. I do not think that any of the claimed errors relating to jury instructions given at the penalty hearing have any bearing on this appeal, as any error in sentencing by the jury is superseded by the proceedings before the three-judge panel. I do not subscribe to any claim by Beets to the effect that if there had not been error at the jury penalty hearing, it would not be necessary for the three-judge panel to have heard the matter at all. The three-judge panel *did* hear and decide the penalty matter; therefore, I discuss only error that might have infected the three-judge hearing. I conclude that there was no error.

Of the four aggravating circumstances found by the three-judge

---

[5]Pursuant to NRS 177.055, we have considered all errors enumerated by way of appeal. We also determine that the evidence was sufficient to establish the existence of aggravating circumstances and holds that appellant's sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor. Additionally, we conclude that appellant's sentence of death is not excessive, considering both the crime and the defendant.

panel there is only one that has any possible infirmity, and that is the charge that the murder was committed while the murder convict was engaged in the commission of sexual assault. I agree with the majority that the statute does not require that the murder victim be the same person that was being sexually assaulted. There is an argument in this case that the homicide was so isolated from the sexual assault that it cannot be rationally maintained that the homicide occurred "while the person was engaged in the commission of . . . any sexual assault." My reading of the record tells me that sexual assault and the homicide were sufficiently connected so as to have justified the panel in concluding that the homicide was committed during an episode closely associated with Beets' sexually assaultive activity. I think that the panel was justified in concluding that the homicide was committed "while" Beets was engaged in the commission of a sexual assault. For the reasons stated, I would affirm the judgment of the trial court.

ROSE, J., concurring:

I concur with the majority in its reasoning and conclusions in affirming the results of the guilt and penalty phases of this case. I am concurring to address the concern JUSTICE YOUNG has expressed in his dissent regarding NRS 175.556.

The jury convicted Beets of first degree murder, but was unable to agree upon the punishment to be assessed in the penalty phase, and the jury was declared deadlocked. At the penalty phase, the jury was instructed that three circumstances could be found to be aggravating to the first degree murder conviction. I agree with the majority's opinion that the only aggravating circumstance that was improperly presented to the jury was the instruction stating that depravity of mind could be an aggravating circumstance.

We have no idea why the jury deadlocked in this case and was unable unanimously to assess a penalty against Beets. The jury may well have rejected the improperly given aggravating circumstance of depravity of mind, or it may have deadlocked on that precise issue. At most, the improperly given aggravating circumstance could have prejudiced the defendant by contributing to an inconclusive result, thus requiring that the sentence be imposed by a three-judge panel.

At the subsequent penalty hearing before the three-judge panel, the findings were made of three aggravating circumstances. Only the aggravation for depravity of mind was improperly found. Given the gruesome facts of this case and that we will affirm a death penalty assessment even if one aggravating circumstance is properly found, *see* Ybarra v. State, 100 Nev. 167, 679 P.2d 797

(1984), I have no problem in finding that a factual basis exists for the assessment of the death penalty.

The focus of our attention at a later time should be on NRS 175.556. This statute provides that a three-judge panel shall sentence a defendant convicted of first degree murder when the jury is unable to reach a unanimous verdict. As stated in his dissent, my colleague JUSTICE YOUNG has a legitimate concern about the effect of this statute. If defendants are consistently more likely to get the death penalty from a three-judge panel than a jury, then it may well be that Nevada's sentencing procedure creates a substantial risk that the ultimate punishment will be inflicted in an arbitrary or capricious manner. This result would be a violation of the Nevada and United States Constitutions.

However, evidence on this issue was not presented by the parties in the proceedings below, nor has this issue been raised on appeal. Before deciding such an important issue, we should have an actual case and controversy from which to make a decision, along with the arguments of the prosecution and the defense. While the statistics cited by JUSTICE YOUNG support his conclusion, I would defer making this decision until the issue is formally presented to this court.

For the reasons stated, I concur with the majority's opinion and would affirm the death sentence assessed against Beets.

STEFFEN, J., concurring:

I concur in the majority opinion affirming Beets' convictions and penalty, but feel compelled to address the non-issue raised by my colleague, JUSTICE YOUNG, in his dissent and tangentially credited by my colleagues JUSTICES SPRINGER and ROSE in their separate opinions. Unfortunately, statistics invite numerous conclusions in almost any area where they are used, and frequently the same statistics may be cited in support of diametrically opposite conclusions. I suggest that the conclusions reached by the dissenting justice are unreliable and simplistic. As a preface to my analysis of the dissent's conclusions, I will add to the chart supplied by my colleague, the following information:

*CASE NAME*

1. PAINE. This matter is awaiting decision by this court. Factual basis for guilty plea and imposition of death penalty involved shooting two taxicab drivers in the head without provocation. The one driver survived, the other was killed.

2. JONES. Factual basis for guilty plea involved shooting and bludgeoning the victim in the head in order to steal the victim's recreational vehicle. Sentencing panel heard eye-witness testimony of the daughter of two victims who were murdered in Florida by Jones.

3. REDMEN. This matter is awaiting decision by this court. Factual basis for conviction involved allegations of the "execution" of the male victim by shooting the victim three times, cutting off the victim's hands and disfiguring the victim's face with a piece of wrought iron.

4. BEETS. In this, the instant case, Beets bludgeoned and stabbed the one female victim to death, and stabbed and bludgeoned the other female victim and inserted the end of a hammer up her vagina. The latter victim survived.

5. KIRKSEY. Beat his victim to death. Evidence admitted concerning other violent crimes, including a shotgun murder and the stabbing to death of his estranged girlfriend in California. State presented a letter written by Kirksey stating that if he had the power to bring life back to all his victims, he would do it so he could murder them again.

6. BAAL. Repaid his victim's kindness in giving him money by stabbing her repeatedly, thus causing her death. Murder was committed in the course of a robbery and while Baal was under a sentence of imprisonment.

7. FLANAGAN I & II. Flanagan strangled and beat his first victim to death and then dismembered the victim's body, placing the head, arms, legs, and chopped torso in garbage bags which he later deposited in dumpsters. He later met and strangled his second victim to death, taking his wallet and clothes and disposing of the body in a remote area.

8. WILLIAMS. Broke into his victim's home while she was asleep. The young woman, who was eight months pregnant, was first tortured by Williams and then brutally stabbed thirty-eight times. The fetus also expired from a lack of oxygen resulting from its mother's death.

9. MORAN I & II. Without warning or provocation, Moran shot two victims, a woman and a man. Each victim was shot four times. Moran also shot and killed his former wife nine days later. Moran was sentenced to death for all three killings, but we found the aggravating circumstances infirm as to the former wife and ordered that sentence reduced to life without possibility of parole.

10. HILL. Killed an elderly, paralyzed woman by repeatedly thrusting a long, wooden stick into her rectum and vagina, perforating her vulva, perineal septum, sigmoid colon, and kidney.

11. COLE. Murdered his female victim in Nevada by strangulation. Was also convicted by jury verdicts in the State of Texas with the murder of three female victims, each by strangulation.

12. WILSON. Stabbed to death an undercover narcotics officer; evidence indicated that the victim pleaded for his life, but survived only approximately 20 minutes after being stabbed nine times. The body was taken to a remote area and buried in a shallow grave.

13. OLAUSEN. Participated with Wilson in the stabbing death of the undercover narcotics officer. The dissent failed to note, however, that this court eventually granted Olausen post-conviction relief for ineffective assistance of counsel, and upon resubmission to another three-judge panel, Olausen was sentenced to life without the possibility of parole.

14. FARMER. Killed his victim by repeated stabbings in furtherance of burglary and robbery.

15. MERCADO. Strangled an inmate to death with a rope. The three-judge panel sentenced Mercado to life without the possibility of parole.

16. PRICE. Involved with Mercado in the strangling of an inmate. Was sentenced by the three-judge panel to life with the possibility of parole.

17. BISHOP. Shot two people while robbing a cashier at a casino. The one victim died; the other survived. At time of murder, Bishop was under a sentence of imprisonment for armed robbery in California. He had also been previously convicted of a felony involving the use or threatened use of violence to the person of another.

I have burdened this concurrence with abbreviated details of the homicides committed by each of the defendants appearing in the statistical chart provided by the dissent because I do not believe a purely statistical analysis without such detail can have any meaning. I also note that this court specifically determined, in Baal v. State, 106 Nev. 69, 787 P.2d 391 (1990), and Hill v. State, 102 Nev. 377, 724 P.2d 734 (1986), that Nevada's three-judge panel sentencing procedure under NRS 175.556 and NRS 175.558 is constitutional. In my opinion, our recent rulings in *Baal* and *Hill* were correct and constitute sound law.

In reviewing once again the nature of the crimes for which fifteen of the seventeen capital defendants identified by the dissent were sentenced to death, I am unable to perceive any basis for concluding that the fairness or objectivity of any of the three-judge panels is subject to serious doubt. Indeed, excluding the two cases as yet undecided by this court, the judgment of each of the sentencing panels has been reviewed by this court and affirmed.

Although we are keenly aware of the problems inherent in an elective system for selecting judges, I find no basis under the statistical data supplied by the dissent for concluding that any of the judges sitting on these cases betrayed their sworn duty to fairly and impartially apply the law. If the dissent's position has merit, then it must be equally clear that we, as appellate judges, have been equally lacking in the fair and impartial application of the law since we have reviewed and affirmed the decisions of each of the panels imposing death on the subject defendants. It appears

to me that if we are to conclude that elected district court judges sitting in panels of three are unfit to consider penalties in capital cases, then, as elected appellate judges who have reviewed and scrutinized their deliberations and conclusions, we must be equally unfit to perform our sworn duties of review.

I suggest that the statistics cited by the dissent as evidence of bias on the part of three-judge panels in favor of death prove nothing of the sort. One need only review the details of each case resulting in the imposition of death to understand why both the three-judge panels and the members of this court on review found that the ultimate penalty was justified. Unless we have been mindlessly fulfilling our responsibilities, we have determined, *after careful review* in each of these cases, that "[n]othing contained in the record indicates that the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor," and that "the sentence of death is not excessive . . . considering both the crime and the defendant." *Hill,* 102 Nev. at 380, 724 P.2d at 736. *See* NRS 177.055(2)(c) and NRS 177.055(2)(d). In short, we have validated the judgment of each of these three-judge panels, and I am unaware of any basis for impeaching the quality or bona fides of our review in any of the cases. Accordingly, there is no basis whatsoever for concluding that capital defendants have been subjected to biased treatment by any of the three-judge sentencing panels.

Moreover, the statistical conclusions reached by the dissent are inaccurate. There were actually 19 sentences (excluding the cases of Paine and Redmen which we have not yet decided) imposed by three-judge panels involving the defendants listed in the chart contained in the dissent. Moran was actually sentenced to death for each of the three killings, and this court ordered the one death sentence reduced to a sentence of life without the possibility of parole. Additionally, Olausen's capital sentence was vacated by this court after post-conviction proceedings and remanded for a new sentencing which included death as an option. The second three-judge panel sentenced Olausen to life without the possibility of parole. Based upon my computations, defendants appearing before three-judge panels have received sentences other than death in sixteen percent of the cases, not eleven percent as found by my dissenting colleague.

Furthermore, I am unable to fathom, given the real-life details involved in the murders involving these capital defendants, how anyone could objectively or empirically derive from these statistics the conclusion that they represent "dire statistical odds" that call into question the constitutionality of our sentencing procedures. Capital cases, which are comparatively few in number in the first place, are simply not susceptible to meaningful statistical analysis in a vacuum. Nor may a determination of the "odds" of

a capital sentence be computed merely by adding up the type of sentences meted out by our three-judge panels.[1] Such panels had to bring to bear the same careful analysis of the crime, aggravating and mitigating factors, and background evidence concerning the defendants that we have had to consider in reaching just determinations. None of these cases are of a "garden variety." I must conclude from the statistical fact that this court has validated the sentences of all but one of eighteen (there was no basis for our reviewing the life sentence given Olausen by the second panel) imposed by our three-judge panels, that they have been correct in at least ninety-four percent of their deliberations. Moreover, in the one Moran death sentence we ordered reduced, we did so on the basis of infirm aggravating circumstances rather than a determination that death was unwarranted, a premise proved by our affirmation of Moran's other two death sentences.

Significantly, the United States Supreme Court, in Spaziano v. Florida, 468 U.S. 447 (1984), affirmed a sentence of death imposed by the trial judge despite the jury's recommendation that the defendant received a life sentence. Pertinent to the instant subject is the following language from *Spaziano:*

> The sentencer, whether a judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. . . . More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. . . . The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

[1]Unless the dissenting justice has in mind some type of sentencing body other than judges or juries, it seems clear to me that in no case could the statistical analysis involving three-judge panels have any validity without comparing them with the results of jury deliberations in cases where the state is seeking the death penalty. For example, the case of Harvey v. State, 100 Nev. 340, 682 P.2d 1384 (1984), readily comes to mind where a jury sentenced the sixteen-year-old defendant to death for a spur of the moment shooting that occurred as the young man was fleeing from a robbery he had committed and suddenly encountered a security guard in the vehicle he intended to use for escape. We concluded that the death penalty was excessive, vacated it and imposed a sentence of life without the possibility of parole. Although I would personally view the comparison as irrelevant, I suggest that without determining whether three-judge panels impose the death penalty significantly more frequently than juries, the conclusions arrived at by the dissenting justice cannot even have colorable validity. Moreover, such a comparison would have to include a determination of the ratio of death penalty affirmances by this court on capital sentences imposed by both sentencing bodies.

. . . .

> In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

*Id.* at 459, 464.

By way of summary, neither the United States Constitution nor the Nevada Constitution requires criminal defendants, including capital defendants, to be sentenced by a jury. Nor does either constitution permit only non-elected judges to participate in the sentencing process. Indeed, if it is constitutional for a single judge to override a jury recommendation of life and thereafter impose a sentence of death, then, *a fortiori,* it is certainly constitutional for three-judge panels who are not overriding jury recommendations, to impose capital sentences. Moreover, I view Nevada's system as enlightened, because it attenuates any "political" pressure on a single judge to impose the ultimate penalty.[2] Finally, the conclusion I reach from the "statistics" presented by my dissenting colleague is that our three-judge panels are responsibly approaching the difficult task which they occasionally are called upon to perform in these very difficult, gut-wrenching cases. This court has officially agreed with the premise by almost invariably placing its imprimatur on the decisions reached by these panels.

Finally, I also part company with my dissenting colleague concerning his conclusion that NRS 200.033(4) requires the sexual assault victim to also be the murder victim. A literal reading of the statute comprehends murder "committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit . . . sexual assault." NRS 200.033(4) (quoted in pertinent part). My colleague's position deprives the statute of its entire scope, for he would find no violation of this statute if a defendant, after raping a mother in the home, then encountered a teen-age son while leaving the scene and killed him. In the instant case, Beets interrupted his approach to sexual assault long enough to kill the sexual assault victim's mother, who had sought to intervene in Beets' criminal conduct. The killing was, in effect,

---

[2]Importantly, the trial judges (circuit court judges) in Florida are also elected. Fla. Const. art. 5, § 15. It should be evident that single elected judges empowered to override jury recommendations and impose capital sentences would be far more susceptible to political pressure than panels of three elected judges who are not empowered to override jury determinations.

an integral part of the planned sexual assault on Beets' former girlfriend. At no place in the statute does the language state or infer that a murder committed during or after a sexual assault or attempted sexual assault has to befall the sexual assault victim.

As noted above, I concur in the majority opinion affirming both the judgment of convictions pursuant to the jury's verdict, and the sentence of death imposed by the three-judge panel.

YOUNG, J., dissenting:

Respectfully, I dissent. I conclude that three aggravating circumstances provided to the jury at the first penalty hearing were improper and therefore I cannot join in the majority opinion affirming the sentence.

Preliminarily, I note that, because the jury was improperly instructed during the first penalty hearing, appellant must be afforded a new penalty hearing. The second penalty hearing before the three-judge panel did not serve to cure the errors. Appellant correctly argues that, if the jury had been properly instructed, the jury may have been able to sentence appellant and the matter may not have proceeded to the three-judge panel. Thus, I conclude that the errors at the first penalty hearing before the jury require a new penalty hearing before a jury.

Jury Instruction No. 46 contained the State's alleged aggravating circumstances. Aggravating Circumstance No. 1 stated "[t]he murder was committed by a person under sentence of imprisonment, to wit: Robbery." In support of this aggravating circumstance, the State offered an April 1980 robbery conviction. At the second penalty hearing before the three-judge panel, it became clear that the robbery conviction had expired on July 18, 1987. Therefore, the instruction was incorrect because appellant was not under imprisonment for robbery when he killed Mrs. Oretha Hames. Hence, Aggravating Circumstance No. 1 had no basis in fact and was improperly presented to and considered by the jury. We have previously held that a penalty phase was flawed by reversible error where a jury found aggravating circumstances with no basis in fact. Jimenez v. State, 105 Nev. 337, 343, 775 P.2d 694, 698 (1989) (Jimenez I).

Aggravating Circumstance No. 3 in Jury Instruction No. 46 stated that "[t]he murder was committed while the person was engaged in the commission of or an attempt to commit any sexual assault." Appellant correctly contends that the aggravating circumstance is unsupported by the evidence because, although appellant did commit a sexual assault, he did not kill the sexual assault victim. Rather, he killed someone else, whom he did *not* sexually assault. No evidence was presented at trial to suggest that appellant killed Oretha during the commission of, or during

the attempt of the commission of, the sexual assault against Vanita.

Moreover, I conclude that construing NRS 200.033(4),[1] strictly in favor of the accused and construing the words in their usual and ordinary sense, allows for the aggravating circumstance only when the victim of sexual assault is also the murder victim. McKay v. Board of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (words in a statute will be given their plain meaning unless this would violate the spirit of the act); Demosthenes v. Williams, 97 Nev. 611, 614, 637 P.2d 1203, 1204 (1981) (a penal statute should be construed in favor of the accused). Therefore, the district court erred in giving Aggravating Circumstance No. 3 in Jury Instruction No. 46 to the jury.

I turn now to the depravity of mind aggravating circumstance in Jury Instruction No. 46 and attendant Jury Instruction No. 47, defining depravity of mind. I conclude that instruction No. 46 was improperly given. We have recently stated that "we construe the instruction and the statute (NRS 200.033(8)) upon which it is based as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind." Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990). *Accord* Jimenez v. State, 106 Nev. 769, 801 P.2d 1366 (1990) (Jimenez II). In this case, no instruction regarding torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself was provided to the jury; only the depravity of mind instruction was given. Therefore, the depravity of mind instruction was erroneous pursuant to our recent decisions in *Robins* and *Jimenez II*.

The majority's conclusion that the depravity of mind aggravating circumstance is harmless error is mistaken. While I maintain that two other aggravating circumstances were erroneously supplied to the jury, the fact remains that, had the jury not received even *one* erroneous aggravating circumstance, it might have been able to sentence appellant and the three-judge panel would not have been appointed. I am most reluctant to conclude that the error is harmless when the stakes are a person's life.

Lastly, I wish to remark on the constitutionality of NRS 175.556 and NRS 175.558. NRS 175.556 provides for the

---

[1]NRS 200.033(4) authorizes an aggravating circumstance for murder committed in the perpetration of sexual assault. It states in pertinent part:

> The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnaping in the first degree . . . .

appointment of a three-judge panel to sentence a defendant convicted of first degree murder when the jury is unable to reach a unanimous verdict.[2] Similarly, NRS 175.558 provides for the appointment of a three-judge sentencing panel when a defendant pleads guilty to first degree murder.

We have previously upheld NRS 175.556 as constitutional. Hill v. State, 102 Nev. 377, 724 P.2d 734 (1986). *Accord* Baal v. State, 106 Nev. 69, 787 P.2d 391 (1990). I have since informally researched the cases decided by this court or pending before this court since the enactment of the statutes in which a three-judge panel was appointed following a guilty plea or a split jury. It is an extreme rarity for a three-judge panel to deliver a sentence other than death. A three-judge panel sentenced the defendant to death in *eighty-nine percent* of the cases. Only eleven percent of the cases resulted in a sentence of life with or life without the possibility of parole. These statistics are illustrated by the following chart.

| CASE NAME | CITE/CASE#/YR. | PLEA/ SPLIT JURY | SENTENCE |
|---|---|---|---|
| 1. PAINE | 21983 | Guilty Plea | Death |
| 2. JONES | 21796 | Guilty Plea | Death |
| 3. REDMEN | 21729 | Split Jury | Death |
| 4. BEETS | 107 Nev 957 (1991) | Split Jury | Death |
| 5. KIRKSEY | 107 Nev 499 (1991) | Guilty Plea | Death |
| 6. BAAL | 106 Nev 69 (1990) | Guilty Plea | Death |
| 7. FLANAGAN I | 105 Nev 135 (1989) | Guilty Plea | Death |
| 8. FLANAGAN II | 105 Nev. 135 (1989) | Guilty Plea | Death |
| 9. WILLIAMS | 103 Nev 227 (1987) | Guilty Plea | Death |
| 10. MORAN I | 103 Nev 138 (1987) | Guilty Plea | Death |
| 11. MORAN II | 103 Nev 138 (1987) | Guilty Plea | Death |
| 12. HILL | 102 Nev 377 (1986) | Split Jury | Death |
| 13. COLE | 101 Nev 585 (1985) | Guilty Plea | Death |
| 14. WILSON | 101 Nev 452 (1985) | Guilty Plea | Death |
| 15. OLAUSEN | 101 Nev. 452 (1985) | Guilty Plea | Death |
| 16. FARMER | 101 Nev 419 (1985) | Guilty Plea | Death |
| 17. MERCADO | 100 Nev 535 (1984) | Split Jury | Life Without |
| 18. PRICE | 100 Nev 535 (1984) | Split Jury | Life With |
| 19. BISHOP | 95 Nev 511 (1979) | Guilty Plea | Death |

Given these dire statistical odds, I have no alternative but to

---

[2]NRS 175.556 states:

> If a jury is unable to reach a unanimous verdict upon the sentence to be imposed, the supreme court shall appoint two district judges from judicial districts other than the district in which the plea is made, who shall with the district judge who conducted the trial, or his successor in office, conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly. A sentence of death may be given only by unanimous vote of the three judges, but any other sentence may be given by the vote of a majority.

conclude that our present sentencing procedures fail to meet constitutional standards as established by the United States Supreme Court.

The Court has stated: "In Furman v. Georgia, 408 U.S. 238, the Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." Godfrey v. Georgia, 446 U.S. 420, 427 (1979). Further, the Court has stated that "[a] capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Id.* at 427 (citations omitted).

Nevada has a system of elected judges. If recent campaigns are an indication, any laxity toward a defendant in a homicide case would be considered a serious, if not fatal, campaign liability. With sixty-one people on death row, Nevada has the highest per capita number of inmates under sentence of death of any state. Candidates, almost without exception, seek to be known for their tough stances on crime. A three-judge panel statistically imposes the death penalty with far greater frequency than a jury.[3] If through the element of caprice, the jury is unable to reach a decision in the penalty phase and determination of the penalty in a death case is given to a three-judge panel, the outcome is fairly predictable. This portion of Nevada's capital sentencing scheme, therefore, fails to distinguish cases in which the death penalty is imposed from those in which it is not.

Furthermore, Nevada and Indiana are the only jurisdictions in which a defendant may be sentenced to death by a judge after a jury is unable to unanimously sentence the defendant.[4] In all other jurisdictions in which the jury sentences the defendant, after the jury is unable to reach a unanimous sentence, the judge must sentence the defendant to life without the possibility of parole.[5] In

---

[3]The Clark County Public Defender's Office advises the court that, since July of 1988, seven defendants were represented before a three-judge panel and *one-hundred percent* of the defendants received a sentence of death. In contrast, defendants appearing before a jury received a sentence of death in only *forty-five percent* of the cases.

[4]Moreover, Indiana is one of the three states in which the judge may override the jury's sentence. Ind. Code § 35-50-2-9 (Supp. 1990); Ala. Code § 13A-5-46 (1982); Fla. Stat. Ann. § 921.141 (West 1985). Therefore, although Indiana is teamed with Nevada in defaulting to a judge when the jury is split, the jury's sentence remains only a recommendation even when it is unanimous.

[5]*See* Ark. Stat. Ann. § 5-4-603(c) (1977 and Supp. 1987); Cal. Penal Code Ann. § 190.4 (West 1988); Colo. Rev. Stat. § 16-11-103 (1986); Conn. Gen. Stat. § 53a-46a (1991); Del. Code Ann., Tit. 11, § 4209 (1987); Ga. Code Ann. § 17-10-31 (1990); Ill. Rev. Stat., ch. 38, § 9-1 (West Supp. 1991); Ky. Rev. Stat. § 532.025 (1990); La. Code Crim. Proc. Ann., Art.

four jurisdictions, the court alone imposes the sentence and, in three jurisdictions, the judge may override a jury's recommendation of life.[6] Because in all but one other jurisdiction a defendant is sentenced to life without the possibility of parole after a jury is split, I am further persuaded that NRS 175.556 is probably not constitutional.

As far as the constitutionality of NRS 175.558 providing for sentencing by a three-judge panel following a guilty plea, I conclude that it is similarly infirm. While other jurisdictions with capital sentencing procedures provide for sentencing by a judge or a panel of judges after a guilty plea, more than half of the jurisdictions extend the defendant's right to be sentenced by a jury after the entry of a guilty plea.[7] While I do not deny that such

---

905.8 (West Supp. 1991); Md. Ann. Code, Art. 27, § 413 (1988); Mass. Gen. Laws Ann., ch. 279, § 70 (Supp. 1991); Miss. Code Ann. § 99-19-101 (Supp. 1990); Mo. Rev. Stat. § 565.030 (West Supp. 1991); N.H. Rev. Stat. Ann. § 630.5 (Supp. 1990); N.J. Stat. Ann. § 2C:11-3(c) (West Supp. 1991); N.M. Stat. Ann. § 31-20A-3 (1990); N.C. Gen. Stat. § 15A-2000 (1988); Ohio Rev. Code Ann. § 2929.03 (1987); Okla. Stat., Tit. 21, § 701.11 (West Supp. 1991); Or. Rev. Stat. § 163.150 (1989); 42 Pa. Cons. Stat. § 9711 (West 1982); S.C. Code § 16-3-20 (Supp. 1990); S.D. Comp. Laws Ann. § 23A-27A-4 (1979); Tenn. Code Ann. § 39-2-203 (Supp. 1990); Tex. Code Crim. Proc. Ann., Art. 37.071 (West Supp. 1991); Utah Code Ann. § 76-3-207 (1990); Va. Code § 19.2-264.4 (1990); Wash. Rev. Code § 10.95.080 (West 1990); Wyo. Stat. § 6-2-102 (1988).

[6]See note 4 *supra*.

[7]Sixty-two percent of the jurisdictions provide that a defendant will be sentenced by a jury after a guilty plea unless the defendant waives the right. See Ark. Stat. Ann. § 5-4-103 and § 5-4-601—5-4-609 (1977); Cal. Penal Code Ann. § 190.4 (West 1988); Del. Code Ann., Tit. 11, § 4209 (1987); Ill. Rev. Stat., ch. 38, § 9-1 (West Supp. 1991); Ky. Rules Ann. CR 9.84 (1990); La. Code Crim. Proc. Ann., Art. 557 (West Supp. 1991); Md. Ann. Code, Art. 27, § 413 (1988); Ann. Laws Mass. GL, ch. 263, § 6 (1980) and ch. 279, § 70 (Supp. 1991); Miss. Code Ann. § 99-19-101 (Supp. 1990); N.H. Rev. Stat. Ann. § 630.5 (Supp. 1990); N.M. Stat. Ann. § 31-20A-1 (1990); N.C. Gen. Stat. § 15A-2001 (1988); Or. Rev. Stat. § 163.150 (1989); 42 Pa. Cons. Stat. § 9711 (West 1982); Tenn. Code Ann. § 39-13-205 (Supp. 1990); Tex. Code Crim. Proc. Ann., Art. 37.071 (West Supp. 1991); Utah Code Ann. § 76-3-207 (1990); Wash. Rev. Code § 10.95.050 (West 1990).

Thirty-eight percent provide for sentencing by a judge or a panel of judges following a plea of guilty. See Colo. Rev. Stat. § 16-11-103 (1986); Conn. Gen. Stat. § 53a-46a (1991); Ga. Code Ann. § 17-10-32 (1990); Mo. Rev. Stat. § 565.006 and § 565.030 (West Supp. 1991); N.J. Stat. Ann. § 2C:11-3(c) (West Supp. 1991); Ohio Rules of Crim. Proc. CR 11 (1987); Okla. Stat., Tit. 21, § 701.10 (West Supp. 1991); S.C. Code § 16-3-20 (Supp. 1990); S.D. Comp. Laws Ann. § 23A-27A-4 and § 23A-27A-6 (1979); Va. Code § 19.2-257 (1990); Wyo. Stat. § 6-2-102 (1988).

Additionally, of the remaining jurisdictions which impose the death penalty, out of the three which provide for a judicial override of the jury's recommended sentence, two provide for sentencing by a jury after a guilty plea. See Fla. Stat. Ann. § 921.141 (West 1985); Ala. Code §§ 13A-5-42—

procedural schemes could pass constitutional muster in other jurisdictions, I remain unconvinced that allowing a three-judge panel to sentence a defendant following a guilty plea is constitutional in Nevada in light of the statistical odds of receiving death from the panel in Nevada.[8] Thus, I conclude that NRS 175.558 is of doubtful constitutionality.

Moreover, returning to the case at bar, the erroneous aggravating circumstances supplied to the jury may well have been the determinant factor in the jury's inability to sentence the appellant. Because of these erroneous instructions, therefore, appellant was then required to be sentenced by a three-judge panel which almost assuredly would sentence him to death. I am mindful that the appellant's acts in this case were particularly reprehensible. However, Justice Hugo Black appropriately wrote: "Bad men, like good men, are entitled to be tried and sentenced in accordance with law . . . ." Green v. United States, 365 U.S. 301, 309-310 (1961). The sentencing procedures utilized in this case were not in accordance with law because they contained a substantial risk that the punishment would be inflicted in an arbitrary and capricious manner.

In sum, I believe the three aggravating circumstances given to the jury were erroneous and require a new penalty hearing. I dissent because I cannot join the majority in affirming the sentence when the jury received these erroneous instructions and when the sentencing procedures used were of dubious constitutionality.

---

13A-5-53 (1982). In Indiana, the third judicial override jurisdiction, the court sentences the defendant following a guilty plea. *See* Ind. Code § 35-50-2-9(d) (Supp. 1990).

[8]The United States Supreme Court has held that there is no constitutional right to be sentenced by a jury. Spaziano v. Florida, 468 U.S. 447 (1984). In *Spaziano,* a Florida judge overrode the jury's recommendation of life and sentenced the defendant to death. The Supreme Court upheld Florida's sentencing scheme as constitutional. *Id.* at 466.

While there is no constitutional right to be sentenced by a jury, there is a constitutional right to be fairly sentenced. I dissent in the instant case because I believe our sentencing procedures are probably unconstitutionally applied. I do not believe that our sentencing scheme is unconstitutional on its face. If the three-judge panel did not sentence a defendant to death in virtually all of the cases, I could confidently assert that the scheme is constitutional. However, this unfortunately is not the case.

It would thus appear that although the Florida sentencing scheme is constitutional on its face, a similar as applied challenge could be made if in Florida the judges always overrode a jury's recommendation of life and sentenced the defendant to death.