TYRONE BOBBY HUTCHINS, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 22928

February 4, 1994                     867 P.2d 1136

---

[24]The Honorable Jack Lehman, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE JOHN MOWBRAY, Chief Justice. Nev. Const. art. 6, § 4. THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this appeal.

[Rehearing denied June 16, 1994]

*Cherry, Bailus & Kelesis,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Deputy District Attorney, Clark County for Respondent.

# OPINION

*Per Curiam:*

A jury convicted appellant Tyrone Bobby Hutchins, a/k/a Tyrone Bobby Hutchinson ("Hutchins"), of robbery, kidnapping with the use of a deadly weapon, and four counts of sexual assault with the use of a deadly weapon. He was sentenced to one twelve-year term on the robbery charge and ten consecutive life terms on the other charges, five of which represent enhancements based upon the use of a deadly weapon. Hutchins raises five assignments of error on appeal.

We conclude that Hutchins' sentences were improperly enhanced for use of a deadly weapon, as scissors are not a "deadly weapon" under the *Zgombic*[1] rule. The five enhancements must therefore be reversed and vacated. We otherwise affirm the remaining judgments of conviction.

## *FACTS*

At trial, the victim ("Tammy") testified that on the evening of September 15, 1990, she was visited by Hutchins, an acquaintance, at the Airport Inn Apartments in Las Vegas. Hutchins

---

[1]*Zgombic v. State*, 106 Nev. 571, 798 P.2d 548 (1990).

asked Tammy if she would loan him some money, but Tammy declined and asked Hutchins to leave. Hutchins then began choking Tammy and dragging her through the apartment. At some point in the struggle, Hutchins also beat the victim. Tammy directed Hutchins to some money in a closet, which Hutchins took, along with some jewelry. Hutchins then bound Tammy's arms, legs and mouth with belts, chipping one of her teeth in the process. He also threatened to kill her if she made any noise.

Hutchins thereafter called a person by the name of "Jose" and forced Tammy to talk to him on the phone about meeting Hutchins to buy her jewelry. Later, Hutchins responded to a knock on the door and, while Tammy was trussed on the floor, engaged in a transaction regarding his victim's jewelry.

After the jewelry transaction, Hutchins returned to his victim with some hair-cutting scissors which he used to cut off the victim's shirt. He also removed the victim's shorts and again warned Tammy that he would kill her if she made any noise. Hutchins then placed the scissors on a counter and proceeded to commit various acts of sexual assault upon his victim, including digital vaginal penetration, cunnilingus and fellatio. Hutchins thereafter untied the victim's legs and placed his penis in her vagina. Tammy thought he ejaculated onto her stomach. Hutchins then freed Tammy's arms and left the apartment. Tammy telephoned the police and her former boyfriend.

After the police arrived, Tammy was taken to the University Medical Center, where she was examined by Dr. John W. Wilson. Wilson testified that Tammy appeared to have been severely beaten and nearly choked to death. Wilson also stated that there were no vaginal tears or lacerations, a common finding among sexual assault victims, and that there was no abnormal amount of mucous membrane secretions.

Linda Errichetto, the State's criminalist, testified that her examination revealed no indication of semen in the victim's oral or vaginal samples. She did find some indication of semen in the victim's panties upon her initial presumptive test, but a second confirming test produced no evidence of semen, thus rendering the test inconclusive. Errichetto also determined that the hairs given her from Tammy's pubic combing belonged to the victim. Accordingly, Errichetto could form no opinion as to whether Tammy had been sexually assaulted.

Photographs of the victim depicting bruises, swelling and scars on her right eye, left cheek and jaw, chest, tongue, right hand, neck, arm and knees were admitted to show the effects of Hutchins' attacks. Photos of the victim's apartment were also admitted showing the blanket upon which she was assaulted, the belts on the floor, the victim's shorts and Hutchins' shirt. The latter

item was demonstrated by the defense to be a tight fit as Hutchins donned the garment at trial. The shirt worn by Tammy and cut by Hutchins was not found or recovered. However, the scissors found by Tammy after her ordeal were introduced into evidence.

Other evidence presented at trial included the testimony of Terry L. Walker, a resident of the Airport Inn at the time of the incident. Walker testified that in the late evening and early morning hours of September 15-16, 1990, Hutchins called her three times. Hutchins was crying and stated that he was scared. He told Walker that he had a fight with Tammy over money or a chain "or something like that." He also said that he had beaten Tammy, and that "his leg was bleeding really bad" where Tammy had angrily hit him.

The defense called Hutchins' wife,[2] Barbara Hutchinson. Hutchinson testified that she picked up the defendant at the Airport Inn on the evening of the 16th, that he was limping, and that he explained that Tammy had hit him in the leg with a pipe. Hutchinson further testified that Hutchins admitted beating Tammy.

The jury found Hutchins guilty of first-degree kidnapping with use of a deadly weapon, robbery, and four counts of sexual assault with the use of a deadly weapon. The court sentenced Hutchins to a twelve-year term on the robbery charge, and to a life term for the kidnapping conviction and for each of the four sexual assault convictions, enhanced by five life terms for use of a deadly weapon, for a total of one twelve-year term and ten life terms, each term to run consecutively.

## DISCUSSION

I. *Whether appellant's convictions were supported by sufficient evidence*

Hutchins' first assignment of error is that his convictions were not supported by sufficient evidence to support a finding of guilt beyond a reasonable doubt. Although his convictions are based primarily on the testimony of the victim, it is for the jury to determine what weight and credibility to give various testimony. Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981). Furthermore, when the sufficiency of the evidence is challenged on appeal in a criminal case, "[t]he relevant inquiry for this Court is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[2]According to her testimony, Hutchinson is appellant's wife, although appellant's counsel's brief refers to her as his mother.

doubt.'" Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). With these standards in mind, we review Hutchins' contentions concerning this issue.

A. *Whether there was sufficient evidence to support the kidnapping conviction*

Hutchins argues that there was insufficient evidence to support his conviction for kidnapping, as the movement of the victim from the living area of her apartment to the closet or hall area did not increase the danger to the victim.

NRS 200.310(1) provides:

> Every person who willfully seizes, confines . . . or carries away any person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person . . . for the purpose of committing sexual assault . . . or robbery upon or from the person . . . is guilty of kidnaping in the first degree.

Tammy's testimony meets the requirements of this statute, showing that Hutchins seized, confined and carried her, intending to hold and detain her for the purpose of committing robbery and sexual assault.

"While the plain language of NRS 200.310(1) does not require asportation, the court has required it when the kidnapping is incidental to another offense, such as robbery, where restraint of the victim is inherent with the primary offense." Clem v. State, 104 Nev. 351, 354, 760 P.2d 103, 105 (1988), *overruled on other grounds,* Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). However, if the victim is physically restrained, "this, in itself, establishes kidnapping as an additional offense." *Clem,* 104 Nev. at 354, 760 P.2d at 105. Moreover, the kidnapping is not incidental to the underlying offense if "the restraint increased the risk of harm" or "had an independent purpose and significance as [being] essential to the accomplishment of" the other offense. *Id.*

In the present case, Tammy was forcibly asported to a different part of the apartment where she was physically restrained and less apt to be heard by a passerby. Additionally, the forcible method used to relocate her to a more secure setting for the assault, coupled with the measures used to accomplish her restraint, created a greater risk of harm without more. *See, e.g.,* Beets v. State, 107 Nev. 957, 962, 821 P.2d 1044, 1048 (1991), *cert. denied,* ...... U.S. ......, 113 S.Ct. 116 (1992) ("[T]he act of binding [the victim's] hands and feet was sufficient evidence to

establish the kidnaping charge since these acts increased the risk of harm to [her] and had independent significance with regard to appellant's ability to commit the sexual assault.'').

Accordingly, we reject Hutchins' challenge to the sufficiency of the evidence to support the conviction for kidnapping.

B. *Whether there was sufficient evidence to support the sexual assault convictions*

Hutchins emphasizes that the only witness to the sexual assaults was the alleged victim, whose credibility the defense sought to impugn. Hutchins also maintains that while the combination of physical evidence and his admissions to other witnesses confirmed that he had beaten the victim, forensic experts were unable to find any physical corroboration of sexual contact.

However, as previously stated, it is for the jury to determine the degree of weight, credibility and credence to give to testimony and other trial evidence, and this court will not overturn such findings absent a showing that no rational juror could have found the existence of the charged offenses beyond a reasonable doubt. Furthermore, this court has long ago determined that the uncorroborated testimony of a victim, without more, is sufficient to uphold a rape conviction. For example, in May v. State, 89 Nev. 277, 279, 510 P.2d 1368, 1369 (1973), we confirmed that ''[it is] a correct statement of the law of this state . . . that in a rape case a jury may convict on the uncorroborated testimony of the prosecuting witness.'' *Id.* (citing Bennett v. Leypoldt, 77 Nev. 429, 432, 366 P.2d 343, 345 (1961)); *see also* Martinez v. State, 77 Nev. 184, 189, 360 P.2d 836, 838 (1961) (the uncorroborated testimony of a prosecutrix in a rape case, standing alone, is sufficient to sustain a conviction).

Hutchins mounts a more specific challenge to the fourth count of sexual assault by contending that the evidence showed only that he had placed his tongue on the victim's vagina and not in it, and thus the requisite penetration was lacking.[3] However, NRS 200.364 and 200.366, upon which the sexual assault counts are based, provide as follows:

200.364 Definitions. As used in [NRS 200.366], unless the context otherwise requires:

. . . .

2. ''Sexual penetration'' means *cunnilingus,* fellatio, or any intrusion, however slight, of any part of a person's body

---

[3]The testimony of the victim on this point is inconsistent and thus inconclusive.

or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including sexual intercourse in its ordinary meaning.

200.366 Sexual assault: Definition; Penalties.

1. A person who subjects another person to sexual penetration . . . against the victim's will . . . is guilty of sexual assault.

Thus, while sexual penetration is required for a count of sexual assault, the act of cunnilingus is considered "penetration" according to that word's statutory definition. Based upon the testimony, the jury was properly able to determine that Hutchins accomplished at least a slight penetration of the victim's vagina by placing his tongue on it. Accordingly, we conclude that even if it were only shown that Hutchins had placed his tongue on and not in the victim's vagina without her consent, this constituted sufficient evidence to sustain a conviction for sexual assault.

II. *Whether scissors are properly considered a deadly weapon for purposes of enhancing Hutchins' sentences*

Hutchins contends that his sentences were improperly enhanced pursuant to NRS 193.165,[4] Nevada's "deadly weapon penalty-enhancement" statute, as scissors are not a "deadly weapon" under Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). In *Zgombic* this court overruled our previously adopted "functional" test for determining whether an instrumentality is a deadly weapon for purposes of NRS 193.165. The *Zgombic* decision, in overruling the functional test adopted in Clem v.

---

[4]NRS 193.165 provides, in pertinent part, as follows:

193.165 Additional penalty: Use of a deadly weapon or tear gas in commission of crime; restriction of probation.

1. Except as otherwise provided in NRS 193.169, any person who uses a firearm or other deadly weapon . . . in the commission of a crime shall be punished by imprisonment in the state prison for a term equal to and in addition to the term of imprisonment prescribed by statute for the crime. The sentence prescribed by this section runs consecutively with the sentence prescribed by statute for the crime.

2. This section does not create any separate offense but provides an additional penalty for the primary offense, whose imposition is contingent upon the finding of the prescribed fact.

3. The provisions of subsections 1 and 2 do not apply where the use of a firearm, [or] other deadly weapon . . . is a necessary element of such crime.

4. The court shall not grant probation to or suspend the sentence of any person who is convicted of using a firearm, other deadly weapon or tear gas in the commission of any of the following crimes:

. . . .

(b) Kidnaping in the first degree;

(c) Sexual assault . . . .

State, 104 Nev. 351, 760 P.2d 103 (1988), embraced the "inherently dangerous weapon" test, meaning "that the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will or is likely to, cause a life-threatening injury or death." *Zgombic,* 106 Nev. at 576-77, 798 P.2d at 551. In other words, *Zgombic* determined that the legislature, in passing 193.165, meant to enhance crimes committed with instrumentalities *designed*—not just *used*—as *"weapons." Id.*

In the present case, the question of whether the scissors were an inherently dangerous weapon was determined by the jury, pursuant to *Zgombic's* admonition that, "in a few close cases where the court cannot determine as a matter of law whether the weapon is or is not a deadly weapon, the judge will need to submit the entire issue to the jury after instructing it on the previously stated definition of a deadly weapon." *Id.* at 577, 798 P.2d at 552. However, it is apparent to this court that scissors are not a "weapon" at all under the "inherently dangerous" test, because when "used in the ordinary manner contemplated by [their] design or construction," scissors do not cause bodily harm nor are they designed for that purpose. Thus, it was error for the district judge to submit the question to the jury in the first place.

The State argues that scissors are analogous to a knife, something which could clearly be classified as a "deadly weapon" even under the "inherently dangerous" standard. However, in addition to their more commonplace uses, knives are often designed as weapons and have been so used throughout history. Scissors, however, are more analogous to tools and other items which are *potentially* harmful when misused, but are not *intended* by their nature or design to be used to cause injury. In this respect, scissors are similar to "knitting needles," mentioned in *Zgombic* as the type of item, the use of which in the commission of a crime should not be the basis for invoking the enhancement statute. *Zgombic,* 106 Nev. at 576, 798 P.2d at 551.

Additionally, this court supported its decision in *Zgombic,* in part, by pointing out that the legislative intent behind the penalty enhancement statute was to deter the carrying and use of "arms" and other "deadly weapons." *Id.* at 575, 798 P.2d at 550; *see also* Kazalyn v. State, 108 Nev. 67, 76, 825 P.2d 578, 584 (1992) ("the Legislature intended to curb the potential violence inherent in the weapon itself and to deter injuries caused by weapons"). This legislative intent is not furthered by enhancing penalties for the use of potentially dangerous household items, such as scissors, in the commission of a crime.

For the reasons specified above, we conclude that five of Hutchins' consecutive life terms, specifically, those relating to the use of a deadly weapon in conjunction with his kidnapping

and sexual assault convictions, must be vacated, as Hutchins cannot be said to have used a "deadly weapon" under the *Zgombic* test.[5]

III. *Whether the district court's instruction to the jury on the definition of reasonable doubt constituted reversible error*

Hutchins contests the propriety of the district court's instruction on reasonable doubt based upon the following sentence: "Doubt to be reasonable *must be actual and substantial,* not mere possibility or speculation." Hutchins contends that this part of the instruction was erroneous, as the statute governing the instruction for reasonable doubt, NRS 175.211, had been amended before trial, deleting the words "and substantial" from the quoted sentence.[6]

We have previously determined that the jury instruction given here, following the former version of NRS 175.211, is constitutional, despite the U.S. Supreme Court's decision in *Cage* (*see supra* note 6), as the word "substantial" was given a much different context and meaning in the former Nevada statute than in the Louisiana instruction. *See* Lord v. State, 107 Nev. 28, 40, 806 P.2d 548, 556 (1991); Beets v. State, 107 Nev. 957, 963, 821 P.2d 1044, 1048-49 (1991), *cert. denied,* ...... U.S. ......, 113 S.Ct. 116 (1992). Accordingly, we decline to reverse on this basis. Although the district court failed to use the language of the current statute, any resulting error does not rise to the level of substantive or constitutional error required for reversal. Nevertheless, in the future, courts are admonished to use the current statutory definition.

IV. *Whether the district court erred in giving a jury instruction on flight*

Hutchins contends that the district court erred in giving the following jury instruction:

---

[5]We elect not to re-examine the *Zgombic* opinion, as urged upon us by the State.

[6]This legislative amendment was apparently in response to Cage v. Louisiana, 498 U.S. 39 (1990), which invalidated a Louisiana jury instruction on reasonable doubt because of its inclusion, among other things, of the term "substantial."

The amendment to Nevada's statute was made effective upon passage and approval on May 2, 1991 (*see* AB 426, 1991 Nev. Stat., ch. 138, §§ 1-2 at 257), two months before Hutchins' July 1991 trial.

> The flight of a person immediately after the commission of a crime or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your deliberation.

Hutchins insists that the quoted instruction should not have been given as there was no evidence of flight; there was only evidence that he had left the scene of the crime.

Our review of the record discloses that there was evidence sufficient to support at least an inference that Hutchins fled. In the early morning hours after the crime, Hutchins was not in his residence, wherever that may have been, despite the fact that his leg was painful and bleeding. Terry Walker testified that Hutchins called her three times in the early morning hours of September 16th, immediately following the incident, from "Ralph's Market." During these calls, Hutchins stated that he was "scared." Inferentially, Hutchins was too "scared" to go where he was living or to a place where he could receive medical attention even though he told Walker that his leg was bleeding badly. Furthermore, Hutchins chose, on the evening of the 16th following the incident, to be picked up and taken to his home by Hutchinson, which appears unusual as Hutchinson testified that Hutchins "really wasn't staying at home" at the time.

These facts justified giving the flight instruction to the jury. It was for the jury to decide whether the facts warranted an inference of flight. This assignment of error is also without merit.

## CONCLUSION AND DISPOSITION

Our disposition of the foregoing issues makes it unnecessary to address the remaining assignments of error.

Accordingly, we affirm Hutchins' robbery, kidnapping, and sexual assault convictions, but reverse and vacate Hutchins' five life sentences for use of a deadly weapon.